### RILEY v. CHARLESTON UNION STATION CO.

1. CONSTITUTION — CONDEMNATION—CORPORATIONS.—STATUTE granting a corporation right to condemn lands is not unconstitutional, in that it does not provide some tribunal to determine any question made by the land owners as to the right and power of corporation to condemn, nor does such statute violate the 14th amendment to the Federal Constitution.

2. CONDEMNATION—UNION STATION—RAILROADS—LEGISLATURE — PUB-LIC USE—FACTS.—A corporation to erect and maintain a union passenger station with all its connecting necessities and with right to condemn lands for such use, is governed by the same rule as governs railroad companies in determining if the property sought to be condemned is for a public use.  The legislative declaration to this effect is binding on the Court, if there be any reasonable ground to support it.  From the evidence here, the Court finds the uses to be public, and the fact that the railroad companies, who are stockholders and whose officers are officers in such corporation, own sites suitable for such station, does not affect it.  What is a public use considered.

3. CONSTITUTION—UNION STATION.—ACT entitled "An act to incor-porate the Charleston Union Station Company," does not violate the provisions of Art. III., Sec. 17, of Constitution,. providing that the act shall relate to one subject and that expressed in the title, because it provides that railroad companies may subscribe to and hold its stock and guarantee its bonds; nor does it contravene Art. IX., Sec. 2, as to amending charters by special act by granting to certain railroad companies the said powers, as the act of incorpora-tion was passed by authority of concurrent resolution.

4. CONDEMNATION—RAILROAD—PUBLIC USE.—The final determination of whether a particular piece of property is required for the pur-pose of a railroad company rests with the courts.  Weight should be given to the fact that the grantee of the legislative power to condemn has determined that the land in question is required, and under facts here reasonable necessity exists to condemn lands in question for use of Union Passenger Station.

5. IBID.— EQUITY — CORPORATION — STOCKHOLDER.— In a proper case equity would look beyond the corporate entity to its constituent stockholders as real parties in interest, but there is nothing in this case which calls on the Court to do so, and to declare that a stock-holding railroad company of this corporation has a site suitable for such station and which should be used in exclusion of other property, there being shown no abuse of discretion or bad faith in proposition to condemn plaintiff's property.

6. EVIDENCE—IRRELEVANT.—That a party whose lands a corporation proposes to condemn was not given personal notice of the introduction of the bill authorizing the condemnation in the Senate. is wholly irrelevant in an action to perpetually enjoin such condemnation.

Before DANTZLER, J., Charleston, June, 1904.    Affirmed.

Action by Ann and Jno. F. Riley against Charleston Union Station Co.    The following is the Circuit decree:

"The defendant, Charleston Union Station Co., was incorporated by a special act of the General Assembly of this State, approved February 20th, 1902 (vol. 23, Statutes at Large, pp. 1168-1171).

"By section 3 of that act, it is vested, among other powers, with the power 'to acquire by purchase, lease or assignment of lease, such real estate as may be necessary for the purposes of its incorporation, and it shall also have power to acquire for said purposes land or easements therein by condemnation, and shall be entitled to all the rights and privileges embraced in section 1743 to 1755 of the Revised Statutes of South Carolina of 1893, and all acts amendatory thereof.'

"Thereafter, the defendant proceeded by virtue of the powers thereby conferred, to condemn certain property owned in fee by Mrs. Ann Riley, one of the plaintiffs herein, in which her coplaintiff, John F. Riley, was interested, as lessee.   Thereupon, this action was commenced by the plaintiffs to enjoin such proceedings.    A temporary order of injunction was, upon application of the plaintiffs, granted against the defendant; and a rule against it issued at the

same time.. Upon return to such rule, the order of injunction was dissolved; and, on appeal to the Supreme Court, the order dissolving such injunction was reversed. 67 S. C., 84.

"Such other proceedings were had as resulted in an order of reference to G. H. Sass, Esq., one of the masters of Charleston County, to take testimony and report the same to this Court; and, upon his report of the testimony taken, the case came on to be heard before me during the session of the Court of Common Pleas for Charleston County. The testimony is voluminous; and the arguments of counsel, made from time to time, were correspondingly elaborate. The plaintiffs assail the constitutionality of the act of incorporation on numerous and various grounds, to wit: 'in that the same is repugnant to and in violation of the fifth and fourteenth amendments to the Constitution of the United States, prohibiting the depriving of any person of his property without due process of law, taking of private property for public use without just compensation, and denying to any person the equal protection of the law.' And, continuing, further allege, 'that the said act of incorporation * * * is on its face and under the facts * * * alleged in this complaint, also unconstitutional, null and void on each of the following grounds, to wit: in that the same is repugnant to and in violation of (a) art. I., sec. 5, of the Constitution of the State of South Carolina, in that it deprives plaintiffs of their property without due process of law, and denies to plaintiffs the equal protection of the laws. (b) Art. I., sec. 17, of the Constitution of South Carolina, in that it takes private property for private use without just compensation being first made therefor. (c) Art. III., sec. 17, of the Constitution of the State of South Carolina, in that it relates to more than one subject expressed in its title. (d) Art. III., sec. 34, of the Constitution of the State of South Carolina, in that it being a case where for the establishment and incorporation of union stations in the State of South Carolina, a general law can be made applicable, a special law (to wit: said act) has been enacted. (e) Art. IX., sec. 2, of the

Constitution of the State of South Carolina, in that the same, not being a general law, but a special law, amends the existing charter of the railroad companies now entering Charleston, to wit: the Southern Railway Co. and the Atlantic Coast Line Railroad Co., by conferring the right upon such railroad companies to guarantee the principal and interest of the bonds of said Charleston Union Station Co., and to guarantee the performance of any other contract whatsoever, that such Union Station Co. may·make in regard to its corporate interest; and also in that it confers upon such railroad companies the right to subscribe to and hold stock in, or bonds of the said Charleston Union Station Co. (f) Art. IX., sec. 20, of the Constitution of the State of South Carolina, providing that no right of way shall be appropriated to the use of any corporation until full compensation therefor shall first be made to the owner or secured by deposit of money, irrespective of any benefit from any improvement proposed by such corporation. (g) Art. VIII., sec. 4, of the Constitution of South Carolina, in that the said act of incorporation granting the right to lay and to operate railroad track or tracks along the streets of Charleston and on the said streets abutting the said premises of plaintiff, as claimed, set forth and delineated in such plan attached to "exhibit A," filed in this Court, was passed by the General Assembly without first obtaining the consent of the city council of Charleston, in control of the streets proposed to be occupied by defendant for such purpose.' These constitutional objections to and criticism of the act referred to will be considered in the order in which they have been made.

"It is sufficient to say in relation to the fifth amendment of the Constitution of the United States, that it has no applicaion to the case at bar, the provisions of that amendment having been and being intended as limitations upon the powers of Congress and as restraints upon the government of the United States, and not upon a State government. *Withers* v. *Buckley et al.,* 20 How., 84.

"Nor are the provisions of the fourteenth amendment of

the Constitution of the United States violated.   One of the attributes of State sovereignty is the right of eminent domain—the right   of   providing   for   the   taking   of   private property for public uses.   'Each State, by virtue of its Statehood, has the right to exercise the power of eminent domain. This is doubted nowhere.   And the provisions of the Federal Constitution do not relate to the eminent domain of the State.'   Am. & Eng. Ency. Law (2d ed.), 1052, citing in note *Barron* v. *Baltimore,* 7 Pet. (U. S.), 243.

"What constitutes a public use?   'The term public use is flexible and cannot be confined to public use known at the time of framing the Constitution.   All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain.   Any use of anything which will satisfy a reasonable public demand for facilities of travel, for transmission of intelligence or commodities, would be public use.'   *Trenton etc. Turnpike Co.* v. *American etc. Commercial News Co.,* 43 N. J. L., 384.   'And it is well established upon the authorities that private property may, under the power of eminent domain, be taken for a right of way, a passenger or freight depot, stock yards, and for engine houses and shops, in which to repair cars and locomotives and the like.'   Am. & Eng. Ency. Law, *supra,* 1074-1075, and authorities cited in note.   *Union Depot Company* v. *Morton,* 83 Mich., 265; *New York etc.* v. *Kip,* 46 N. Y., 546.   It is well settled by the authorities cited and under other authorities which could have been named, that the property sought to be condemned is for *public use*.   And the act, incorporating the defendant and empowering it to condemn property, and making such condemnation proceedings subject to the provisions of sections 1743-1755 of the Revised Statutes of 1893 (now sections 2187-2199 of vol. 1, Code of Laws of 1902), amply provides for the protection of property owners and for compensation for property so condemned.

"The contention, that the act in question violates art. I., sec. 5, and art. I., sec. 17, of the Constitution of South Caro-

lina, is disposed of by what has been hereinbefore stated. But it is averred, that the act 'relates to more than one subject expressed in its title,' and is, therefore, repugnant to art. III., sec. 17, of the Constitution of this State. A comparison of this article and section with art. II., sec. 20, of the Constitution of 1868, will show that the language is *identical*. And our Supreme Court, in *Connor* v. *Railway Company*, 23 S. C., at pages 434, 435, construing sec. 20, of art. II., of the Constitution of 1868, said: 'Sec. 20, art. II., of the Constitution, with which the act here in question is supposed to be inconsistent, reads as follows: "Every act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." As we have said in *Charleston* v. *Oliver* (16 S. C., 56), upon the authority of Mr. Justice Cooley, "there has been, and ought to be, a general disposition to give a liberal construction to constitutional provisions like this now under consideration, rather than to embarrass legislation by an unnecessary strictness of construction. Hence, when a question, under a clause of the Constitution, is presented for adjudication, we are bound to make a liberal and enlarged view, and if practicable bring the legislation which is assailed as unconstitutional within the limits prescribed by the supreme law of the land. Now, looking at the act in question in this spirit, we do not see how it conflicts with the provisions of the Constitution which has been quoted. The "subject" to which the act relates is the Green Pond, Walterboro and Branchville Railway Co., and that subject is undoubtedly expressed in the title. Nor do we find that the act relates to any other subject. As is usual with acts bearing such titles, after constituting certain persons a body politic and corporate by the name which they have chosen, it goes on to declare what such corporation may do, and how it may obtain the means for effecting the desired purpose—by receiving subscriptions to its capital stock. The fact that it also provides that a certain corporation, which otherwise would not have the power to do so, may subscribe to the capital stock upon certain prescribed conditions, does

not, it seems to us, bring that portion of the act in conflict with the Constitution. No new *subject* is introduced into the act, but the subject which all the while engages the attention of the legislature is the railway, which necessarily includes any appropriate means for its construction. For, as is well said in *San Antonio* v. *Mehaffy* (96 U. S., 315), when an act of the legislature expresses in its title the object of the act, the title embraces and expresses any lawful means to achieve the object, thus fulfilling the constitutional injunction that every law shall embrace but one subject, and that shall be expressed in its title.'

"The provisions of the act assailed in the case cited and quoted from differed, in no essential respects, from the provisions of the act assailed in this case; and the reasoning of the Supreme Court, and the conclusion announced in *Connor* v. *Railway Company, supra,* sustained the constitutionality of the act, in that particular, now under consideration. And such is the conclusion of this Court.

"It is further alleged, that sec. 34, of art. III., of the Constitution of this State, has been violated, 'in that it being a case where, for the establishment and incorporation of union stations in the State of South Carolina, a general law can be made applicable, a special law (to wit: said act) has been enacted.' That sec. 34, of art. III., declares: 'The General Assembly of this State shall not enact local or special laws concerning any of the following subjects or for any of the following purposes, to wit:' then follows an enumeration of the subjects and purposes prohibited. In division 'XI.' of that section, it is provided: 'In all other cases, where a general law can be made applicable, no special law shall be enacted.' Standing alone and construed alone, this constitutional inhibition would be decisive of the question in favor of the contention of the plaintiffs. But sec. 2, of art. IX., of the Constitution of 1895, provides: 'No charter of incorporation shall be granted, changed or amended by special law, except in the case of such charitable, educational, penal or reformatory corporations as may be under the control of the

State, or may be provided for in this Constitution, but the General Assembly shall provide by general laws for changing or amending existing charters, and for the organization of all corporations hereafter to be created, and any such law so passed, as well as all charters now existing or hereafter created, shall be subject to future repeal or alteration: *Provided,* That the General Assembly may by a two-thirds vote of each house on a concurrent resolution allow a bill for a special charter to be introduced, and when so introduced may pass the same as other bills.'

"It is well known that the fundamental principle to be followed in the interpretation of Constitutions is that a Constitution must be considered as a whole; and that no construction which raises a conflict between parts of the instrument is admissible if, by any reasonable construction, they can be made to harmonize. The rule laid down by Judge Cooley (Cooley on Const. Lim., 58), is that, 'effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the Courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.' Says the same author: 'It is scarcely conceivable that a case can arise where a Court would be justifiable in declaring any portion of a written Constitution nugatory because of ambiguity. One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.' Can division XI., of sec. 34, art. III., be made to harmonize with sec. 2, of art. IX.? There seems to be no difficulty whatsoever, if the proviso of the latter section can be made to apply to and modify division XI., of sec. 34, of art. III. It is necessary for this to be done in order to reconcile the inhibition of that division with the proviso of sec. 2, of art. IX., unless sec. 2, of art. IX., be construed to apply, solely, to corporations.

In either event, the conclusion follows, that the act in question is not unconstitutional, in this respect, if the General Assembly, 'by a two-thirds vote of each house, on a concurrent resolution,' allowed a bill for the special incorporation of the defendant to be introduced, and passed such bill. Such condition precedent having been fulfilled, the act, so far as this contention is concerned, is, therefore, a valid act.

"It is further alleged and contended, that the act incorporating the defendant is violative of art. IX., sec. 2, of the Constitution of the State of South Carolina, in that the same, not being a general law, but a special law, amends the existing charter of the railroad companies now entering Charleston, to wit: the Southern Railway Co. and the Atlantic Coast Line Railway Co., by conferring the right upon such railway companies to guarantee the principal and interest of the bonds of said Charleston Union Station Co. and to guarantee the performance of any other contract whatsoever, that such Union Station Co. may make in regard to its corporate interest, and also in that it confers upon such railroad companies the right to subscribe to and hold stock in, or bonds of, the said Charleston Union Station Co. The portion of the act assailed by this allegation is that portion of section 5, beginning on the first line of page 1170, and is in the following words: 'and such railroad company or companies shall have the right, severally or jointly, or jointly and severally, to guarantee the principal and interest of such bonds as may be issued by the Charleston Union Station Co., and may in like manner guarantee the performance of any other contract whatsoever that such Union Station Co. may make in regard to its corporate business; and any such railroad company or companies shall have the right to hold and dispose of shares of the capital stock of the said Charleston Union Station Co, or the bonds that may be issued by it.'

"An examination of the act shows that neither the name of the Southern Railway Co. nor that of the Atlantic Coast Line Railroad Co. appears in it, but the power to do the acts complained of is conferred upon 'any railroad company

30—71.

whose railroad enters the city of Charleston, * * *' It is suffi-
cient to say, in relation to this proposition, that even if the
power intended to be conferred by the act upon railroad
companies was unconstitutional legislation, the constitution-
ality of the act would not be affected, because the life of the
defendant corporation in no way depends upon the exercise
of such power or powers on the part of such railroad compa-
nies.

"The objection that the act violates 'art. IX., sec. 20, of
the Constitution of the State of South Carolina, providing
that no right of way shall be appropriated to the use of any
corporation until full compensation shall first be made to the
owner or secured by a deposit of money, irrespective of any
benefit from any improvement proposed by such corporation,'
cannot be sustained.   It is evident, from an examination of
the statute upon this subject (sec. 2194, Code of Laws of
1902, vol. 1), by which the defendant is to be governed, that
the payment of compensation is a prerequisite for any appro-
priation of any right of way; no interest vests until compen-
sation is paid, and, therefore, no appropriation is made, or
can be made, until that condition is met and performed.
*Gillison* v. *Railroad Co.,* 7 S. C., 173; *Buckner* v. *Railroad
Company,* 7 S. C., 325.

"It is finally urged that 'art. VIII., sec. 4, of the Constitu-
tion of South Carolina,' is violated, in that the 'said act of
incorporation granting the right to lay and operate railroad
track or tracks along the streets of Charleston and on said
streets abutting the said premises of plaintiff, as claimed, set
forth and delineated in such plan attached to "Exhibit A,"
filed in this Court, was passed by the General Assembly
without first obtaining the consent of the city council of
Charleston, in control of the street, proposed to be occupied
by defendant for such purpose.'

"That part of the act of incorporation of the defendant,
within the purview of the above criticism, is sec. 4 thereof,
and is as follows: 'That whenever it may be necessary in
order to enable said corporation to acquire and construct

proper railroad facilities in said city of Charleston, S. C., or to connect such facilities with the tracks of any railroad company with which said corporation may have contracted to furnish such facilities, said corporation, with the consent of the proper authorities of the said city of Charleston, shall have the right to lay and operate a railroad track or tracks, a bridge or bridges, across, along or over, or under, any such street where it shall be necessary in order to furnish proper railroad terminal facilities in said city; but no street of said city shall be obstructed or interfered with until the consent of the proper authorities of said city shall have been first obtained.'

"Sec. 4, of art. VIII., of the Constitution, which it is claimed that section of the act, just quoted, contravenes, is as follows: 'No law shall be passed by the General Assembly granting the right to construct and operate a street or other railway, telegraph, telephone or electric plant, or to erect water or gas works for public use, or to lay mains for any purpose, without first obtaining the consent of the local authorities in control of the streets or public places proposed to be occupied for any such or like purposes.' It is manifest that this constitutional prohibition has not been violated. It is expressly provided in the act, that 'no street of said city shall be obstructed or interfered with until the consent of the proper authorities of said city shall have been first obtained.' The granting of the right is predicated upon the 'consent of the proper authorities of said city * * * first obtained.' Without such consent, there can be no grant of such right; the right is granted only when such consent is had, and not until then.

"Therefore, for the reasons hereinbefore specifically stated, the various and numerous objections interposed by the plaintiffs to the constitutionality of the act, incorporating the defendant, are overruled.

"The issues raised by the pleadings, in relation to the allegations contained in paragraphs '11' and '12' of the com-

plaint, will now be considered, the following being such allegations:

" '11. Plaintiffs further allege that the right of way claimed and required by the defendant over said land of the plaintiff heretofore particularly described is not necessary for the purpose of its incorporation and operation, as particularly set forth in said act.'

" '12. And plaintiffs further allege that the Southern Railway Co. and the Atlantic Coast Line Railroad Co. are the only two railroad systems entering the city of Charleston and having *termini* in the city of Charleston; that officers of the said defendant company, and all stock of said defendant company was subscribed and now owned by the said South-, ern Railway Co. and Atlantic Coast Line Railroad Co., and that under and by the terms of the said act of the General Assembly the said union station can now be leased or used only by the said Southern Railway Co. and the Atlantic Coast Line Railroad Co., both and each of which said railroad systems already have as railroad corporations, and the successors of railroad corporations, land heretofore already condemned for public use by and under power of eminent domain, situated in the city of Charleston, suitable and sufficient and advantageously located for such union station for use of such railroads and all other railroads, and it is not necessary, but oppressive, to further exercise the power of eminent domain of the State of South Carolina by and through the said defendant company to condemn and take from the plaintiff forcibly their lands and home and destroy their business for the benefit of the said Southern Railway Co. and the Atlantic Coast Line Railroad Co., in addition to the lands now already owned by the said railroad systems, and each of them capable of serving the same public purpose and use.'

"The defendant has the right and power, under the act of incorporation, to condemn 'such real estate as may be *necessary* (italics mine) for the purpose of its incorporation; and, for such purposes, is entitled to all the rights and privileges embraced in sections 1743 to 1755 of the Revised Statutes of

South Carolina of 1893, and all acts amendatory thereof.' Is it *necessary* 'for the purpose of its incorporation,' for the defendant to condemn the property it has sought to condemn? The question raises another question of law and fact: as to the legal meaning of the word 'necessary,' and whether or not, in the light of such legal construction, it is necessary, under the testimony, for the defendant to condemn such property for the purpose of its incorporation?

" 'As to the degree of necessity which must exist, there is, as might be expected, considerable difference of opinion. Some Courts have held that the necessity must be an absolute one, but the better opinion is that it must be a reasonable one.' Lewis on Eminent Domain (2d ed.), sec. 276. 'If the authority permits the acquisition of as much as may be necessary, or in still more general terms confers the power to condemn property for the purposes of the undertaking, it will be construed to authorize the taking of so much as may be reasonably necessary under the circumstances.' *Id.,* sec. 279. And on page 675, the same author lays down the following general rule: 'In general the condemnor is allowed a large discretion in determining the quantity necessary, and the exercise of this discretion will not be interfered with except in case of abuse. The grantee of the right to exercise the power of eminent domain can do nothing in exercising the power that is not prescribed in the grant from the legislature in express terms or by necessary implication; and every provision in the act or statute conferring the grant must be followed with the utmost strictness. Yet when the right is granted, the grantee is allowed to exercise much discretion in determining what and how much land shall be taken, and where and how the work shall be located. In general, if there appears to be no bad faith on the part of the grantee in the matter of location, his discretion will not be interfered with.' In the note, numerous authorities are cited to support the rule announced in the text above quoted; among them, the case of *New York Cent. etc. R. Co.* v. *Metropolitan Gaslight Co.,* 5 Hun. (N. Y.), 201, wherein the following

opinion is stated to have been expressed: 'Upon the point
that the lands proposed to be taken are not necessary, because
it might be practicable for the respondents to lay their tracks
upon their own lands by adopting another curve, we are not
prepared to concur with appellant's counsel. It is not a
question of possibilities nor of strict practicabilities, within
the opinion of engineers. No route was ever surveyed for a
railroad which was not open to such objections, and if the
right to take lands was to be determined by conflicting evi-
dence, whether, after all, the tracks might not, with greater
or equal convenience, be laid elsewhere, the construction of
a road would be 'attended with the most serious embarrass-
ments. Reasonable necessity must be shown, but a reason-
able discretion must be allowed to the officers who locate the
tracks of a railroad, for it cannot be presumed that the corpo-
ration is unnecessarily incurring heavy expenses in obtaining
lands, when those it already has would answer its purposes.
We think enough was shown to bring this case within the
rules of the authorities in respect to this question. *New*
*York etc. R. Co.* v. *Kip,* 46 N. Y., 546, 7 Am. Rep., 385;
*Matter of Boston etc. R. Co., N. Y.,* 574.'

"The rule as settled by the great weight of authority is,
that one empowered to condemn property cannot capri-
ciously, or in bad faith, do so; but that a reasonable necessity
must exist for such condemnation. Such being the rule, as
I understand it, I am satisfied from the testimony in this case,
that the property undertaken to be condemned by the defend-
ant is reasonably necessary 'for the purposes of its incorpo-
ration;' and I so conclude as matter of fact and law.

"The Southern Railway Co. owns no property which is
practicable for the purposes of the incorporation of the
defendant. Mr. R. G. Rhett, a witness, was asked this
question: 'Will you state the reasons which induced you and
the committee to recommend the Chapel street station?' He
replied as follows: 'The reasons that induced me were be-
cause it is impossible, in my judgment, to operate any large
number of passenger trains through the centre of the city.

A number of streets have to be crossed, slow speed is necessary, and moreover a station must occupy necessarily more ground than one square.   From John to Ann street is something over 400 feet, I think, and the shed itself, proposed, is 600 feet.   Therefore, it would be for that reason absolutely impossible to have a union station shed at John street.   At Line street the same difficulty would occur.   Sheppard street has been a bone of contention for some time, and if that street should be opened, it would be impracticable to have a station there.   Moreover, in my judgment, a number of streets should be opened between, running from King to Meeting street, just above Line, and, therefore, I am satisfied it was out of the question to put a union station at any of the points along the Southern Railway track.'   The introduction of this testimony was objected to by counsel for plaintiffs, though no exceptions to its admission were filed; however, I think that it was relevant and competent.   The witness gave his reasons for the opinion expressed by him, and it was certainly relevant in relation to the question of good faith. Upon consideration of such testimony, and testimony of like character, and upon consideration of the whole testimony respecting the subject matter of inquiry, I am convinced that it would be impracticable to establish a union station on any of the property of the Southern Railway Co., due regard being had to the public interests.

"The Atlantic Coast Line Co. owns property near the property sought to be condemned.   At reference held previous to the beginning of the hearing of this case, prominent and disinterested witnesses testified that the Riley property was necessary to be had for the location and operation of the union station, if such station was located on Chapel street, and Chapel street was thought, by them, to be the most advantageous site for such station.   Subsequently, during the hearing of this case, I made an order that other testimony be taken, and I find from such testimony, and from the whole testimony, that, while the Atlantic Coast Line Railroad Co. owns property on Chapel street, yet, in order to secure an

advantageous site on its property for such union station, it would be necessary for the railroad company to remove its freight station, its freight buildings and yards, elsewhere.

"Mayor R. G. Rhett, who was examined at a reference held during the session of this Court, said: 'I think the ideal situation is across the street, but it is now occupied by the freight station of the Atlantic Coast Line. If they could arrange to transfer that station eastward, toward the river, or might have it practically at some site without crossing Bay street, that would be my idea of the best location in the city. Whether practicable or not, from a railroad standpoint, of course, I do not know.' Furthermore, the same witness said: 'In fact, I think that an ideal spot, if you could take up the freight station of the Coast Line and move it eastward, or move it out of the way.' The same witness at a previous reference said: 'The Chapel street station is peculiarly well situated, inasmuch as it is within a little over two squares of Meeting street, and yet the approaches to it are through marshes and through sections not built up. Trains can be run quickly in and out of this station, and at the same time come almost into the heart of the city. Moreover, this station has streets on three sides, making the approaches peculiarly advantageous for a union station.' He furthermore said: 'In my judgment, it is absolutely impracticable to establish a union passenger station on the Chapel street site without the acquisition of the Riley property.'

"The meaning of the witness, evidently, is this: That the acquisition of the Riley property is necessary if the union station is put on Chapel street; provided, the Atlantic Coast Line Railroad Co. does not remove its freight buildings and yards elsewhere; but that it is not necessary if such railroad company removes its freight buildings and yards and places the union station on the space occupied by them.

"But the Atlantic Coast Line Railroad Co. contends that it needs all the land that is available for its freight business, and that, even if its freight station and yards were removed, there would not be sufficient property available for that

purpose.    I am not prepared to say that such is not the case. Mr. J. R. Kenley, a witness, and an official of the Atlantic Coast Line Railroad Co., said: He was asked this question: 'Since you testified, there have been certain gentlemen here, Mr. Rhett and others, who have testified that you had room enough on the lands of the Atlantic Coast Line, to the east of Bay street, upon which to put the new union passenger station.    What have you to say with regard to that?'    His answer was: 'Well, in my judgment, it is not practicable to build the new union station east of Bay street.    To say that we have not got the land—if we tore out everything we have there, and devoted everything we have there to a union station, it could be put there, but it is not practicable.'    He was further questioned: 'The testimony of some of them was that you might move your present freight houses, or certainly the one on Bay street, and put your union station where that depot now is.    What have you to say with regard to that suggestion?'    He answered: 'We could not do that without giving up room that is absolutely necessary for our freight facilities.    I think those gentlemen, before we got through with the discussion, were satisfied that was true.    However, in my judgment, it is true.    We have not got as much ground as we ought to have in Charleston to-day for our freight facilities, and the city is growing and the business is growing.    We are now going to develop every foot we have got that is available for our freight business, and the sooner we do it the better it will be for us and for our patrons.'

"So far as the Atlantic Coast Line Railroad Co. is concerned, I find and conclude that the property in question is reasonably necessary for the purposes of the incorporation of the defendant.

"Furthermore, where a corporation, owning no property, is empowered to condemn property for the purpose of its incorporation, such corporation, in condemnation proceedings for such purposes, is not required to condemn the property of a stockholder to the exclusion of any other property which may be necessary for its corporate purposes.

"Counsel for the defendant, in the course of argument, moved that certain testimony of Mr. John Riley, in relation to the introduction of the bill to incorporate the defendant, be stricken out. The motion is granted, and it is so ordered. The testimony is incompetent and irrelevant, so far as the issues are involved. Not only has there been no improper motive shown in the introduction and passage of the bill, incorporating the defendant, but the General Assembly is presumed to have acted in good faith, and it is not the province of Courts to inquire into its motives and purposes.

"Having disposed of all issues raised by the pleadings, it is finally ordered, adjudged and decreed, that the order of injunction heretofore made be, and hereby is, vacated; that the injunction heretofore granted be, and hereby is, dissolved, and the complaint herein be dismissed."

The plaintiffs appeal on the following exceptions:

"Exception first. The Court erred in not holding that the act incorporating the defendant company was unconstitutional, null and void under the fourteenth amendment to the Constitution of the United States, prohibiting the depriving of any person of his property without due process of law.

"Exception second. The Court erred in holding: 'Nor are the provisions of the fourteenth amendment of the Constitution of the United States violated. One of the attributes of State sovereignty is the right of eminent domain; the right of providing for the taking of private property for public uses. "Each State, by virtue of its Statehood, has the right to exercise the power of eminent domain. This is doubted nowhere. And the provisions of the Federal Constitution do not relate to the eminent domain of the State.' "

"On the grounds:

"1. That the act, February 20, 1902, vol. 23, Statutes at Large, South Carolina, pp. 1168-1171, does violate the fourteenth amendment to the Constitution of the United States, in that it operates to taking private property without due process of law, without providing a tribunal for the hearing

and determination of the question as to the necessity for the taking of said land, and also as to the existence of the corporation, or trial of any other fact necessary to exercise the power of eminent domain by the defendant company, except the amount of compensation to be paid.

·"2. On the ground that the provisions of the Federal Constitution, and particularly the fourteenth amendment to the Constitution of the United States, prohibiting the depriving of any person of his property without due process of law, does relate to eminent domain of the State of South Carolina, and does, as a constitutional principle, control the law of eminent domain in the State of South Carolina.

"Exception third. The Court erred in holding as follows: 'It is well settled by the authorities cited, and under other authorities which could have been named, that the property sought to be condemned is for public use.' On the ground that under the facts and circumstances of this case, alleged and proven, that the property sought to be condemned is not for public use, but for private use, against the provisions of art. I., sec. 17, Constitution of South Carolina, prohibiting the taking of private property for private use.'

"Exception fourth. The Court erred in holding: 'And the act, incorporating the defendant and empowering it to condemn property, and making such condemnation proceedings subject to the provisions of sections 1743-1755 of the Revised Statutes of 1893 (now sections 2187-2190, of vol. 1, Code of Laws of 1902), amply provides for the protection of property owners and for compensation for property so condemned.' On the ground that the act of February 20, 1902, 23 Statutes, South Carolina, subject to provisions of sections 1743-1755 of the Revised Statutes of 1893, now sections 2187-2199, vol. 1, Code of Laws of 1902, does not provide for the protection of property owners, in that it fails to provide any hearing to the land owner as to the necessity for the taking of his property, or as to the question of incorporation of the company, and other facts necessary before the right of eminent domain can be exercised, and on the further ground

that such statute provides only for the assessment of compensation for property condemned, and provides for determination of no other question.

"Exception fifth. The Court erred in not holding the said act incorporating the defendant company unconstitutional, null and void, under art. I., sec. 5, Constitution of South Carolina, prohibiting the depriving of any person of his property without due process of law. The Court further erred in holding: 'The contention that the act in question violates art. I., sec. 5, and art. I., sec. 17, of the Constitution of South Carolina, is disposed of by what has been hereinbefore stated.' On the ground that the said act is unconstitutional in depriving plaintiffs of private property without due process of law, and on the ground that the said act does not provide for the hearing and determination of any question made by the land owner as to the necessity of the taking of such land, or any other question necessary to the exercise of such right by the defendant company, but provides only for the determination of amount of compensation to be paid to the land owner.

"Exception sixth. The Court erred in holding that said act incorporating defendant company is not repugnant to sec. 17, art. III., of the Constitution of South Carolina, in that it relates to more than one subject expressed in its title, on the ground that, besides incorporating the defendant company, the said act amends existing charters of the railroads entering Charleston, to wit: Atlantic Coast Line Railroad and Southern Railway, by a special law and not by a general law—forbidden by art. IX., sec. 2, of the Constitution of South Carolina.

"Exception seventh. The Court erred in holding that said act does not violate sec. 34, art. III., of the Constitution of South Carolina, in that, being a case where for the establishment and incorporation of union stations in the State of South Carolina, a general law can be made applicable. a special law, to wit: said act, has been enacted.'

"Exception eighth. The Court erred in holding that the

said act incorporating defendant company did not violate art. IX., sec. 2, of the Constitution of the State of South Carolina, in that the same not being a general law, but a special law, amends the existing charters of the railroad companies now entering Charleston, to wit: Atlantic Coast Line Railroad Co. and Southern Railway Co., by conferring the right to guarantee the principal and interest of the bonds and performance of any contracts whatsoever that such Union Station Co. may make as to its corporate interest, and the right to subscribe to and hold stock and bonds of the defendant company.

"Exception ninth. The Court erred in holding: 'Even if the power intended to be conferred by the act upon railroad companies was unconstitutional legislation, the constitutionality of the act would not be affected, because the life of the defendant corporation in no way depends upon the exercise of such power or powers on the part of such railroad companies.' On the ground that it was provided by sec. 2 of said act, that 'the said company may be organized and commence business when the sum of $50,000 has been subscribed to its capital stock,' and it appearing from the evidence that of the $50,000 of stock subscribed, nine-tenths thereof is the invalid stock subscriptions of the Southern Railway Co. and the Atlantic Coast Line Railroad Co., the defendant corporation is not organized under the act, and its corporate life has not actively begun in law, and it is without authority of law to institute condemnation proceedings under said act.

"Exception tenth. The Court erred in not holding that the defendant company is not duly incorporated and not duly organized and authorized to commence business under the terms of the act of incorporation, on the ground that fifty per cent. of the capital stock has not been lawfully subscribed, it appearing that nine-tenths of the subscription to the $50,000 total capital stock subscribed are invalid subscriptions, because subscribed by the Atlantic Coast Line Railroad Co. and the Southern Railway Co., whose authority for such subscription being the amendment of their charters of said

railroad companies by said special act incorporating defendant company (and not by general law), is unconstitutional, null and void, under sec. 2, art. IX., of the Constitution of South Carolina.

"Exception eleventh. The Court erred in holding that the rights of way claimed and required by the defendant over the said lands of plaintiffs, particularly described in the complaint, are 'necessary' for the purpose of incorporation and operation of the defendant company, as particularly set forth in said act.

"Exception twelfth. The Court erred in not finding and holding, as alleged, 'that the Southern Railway Co. and the Atlantic Coast Line Railroad Co. are the only two railroad systems entering the city of Charleston and having *termini* in the city of Charleston; that officers of the said two railroad systems are the corporators and officers of the said defendant company, and substantially all stock of said defendant company was subscribed and now owned by the said Southern Railway Co. and Atlantic Coast Line Railroad Co.; and that under and by the terms of the said act of the General Assembly, the said union station can now be leased or used only by the said Southern Railway Co. and the Atlantic Coast Line Railroad Co., both and each of which said railroad systems already have as railroad corporations, and the successors of railroad corporations, land heretofore already condemned for public use by and under power of eminent domain, situated in the city of Charleston, suitable and sufficient, and advantageously located for such union station for use of such railroads and all other railroads; and it is not necessary, but oppressive, to further exercise the power of eminent domain of the State of South Carolina by and through the said defendant company to condemn and take from the plaintiffs forcibly their lands and home, and destroy their business, for the benefit of the said Southern Railway Co. and the Atlantic Coast Line Railroad Co., in addition to the lands now already owned by the said railroad systems,

and each of them capable of serving the same public purpose and use.'

"Exception thirteenth.    The Court erred in holding 'that the property undertaken to be condemned by the defendant is reasonably necessary "for the purposes of its incorporation;" and I so conclude as matter of law.'

"Exception fourteenth.    The Court erred in holding that 'the Southern Railway Co. owns no property which is practicable for the purposes of the incorporation of the defendant.'

"Exception fifteenth.    The Court erred in holding 'that it would be impracticable to establish a union station on any of the property of the Southern Railway Co., due regard being had to the public interests.'

"Exception sixteenth.    The Court erred in holding 'that while the Atlantic Coast Line Railroad Co. owns property on Chapel street, yet, in order to secure an advantageous site on its property for such union station, it would be necessary for the railroad company to remove its freight station, its freight buildings and yards elsewhere.'

"Exception seventeenth.    The Court erred in holding as follows: 'So far as the Atlantic Coast Line Railroad Co. is concerned, I find and conclude that the property in question is reasonably necessary for the purposes of the incorporation of the defendant.'

"Exception eighteenth.    The Court erred in holding that all of the property and rights of way in question, as set forth in the proceedings for condemnation and original plat thereto attached, are necessary for the purposes of incorporation and operation of the defendant company, particularly that the rights of way claimed for the location and operation of the turn-table and tracks leading thereto, as delineated on original plat, are necessary for the incorporation and operation of the defendant company.

"Exception nineteenth.    The Court erred in not holding that the rights of way claimed as required and necessary for the location and operation of the turn-table and tracks

leading thereto, as delineated on original plan attached to condemnation proceedings, are not necessary for the incorporation and operation of the defendant company.

"Exception twentieth. The Court, under the facts alleged and proven in this case, erred in holding as follows: 'Furthermore, where a corporation, owning no property, is empowered to condemn property for the purposes of its incorporation, such corporation, in condemnation proceedings for such purposes, is not required to condemn the property of a stockholder to the exclusion of any other property which may be necessary for its corporate purposes.'

"Exception twenty-first. The Court erred in not holding that a corporation is purely a fiction of the law intended to promote justice, and can never be invoked to accomplish its defeat; and that this case being a cause in equity, and it being established that the Union Station Co. is a company formed by the Atlantic Coast Line Railroad Co. and the Southern Railway Co. and their officers, for their benefit; its stock is owned by both of these railroad companies, and its officers are the officers of the defendant company, and that the real owners and only possible users and lessees are the said stockholders, the Atlantic Coast Line Railroad Co. and the Southern Railway Co., a court of equity should disregard the 'fiction' of the corporation and look to the real owners and real parties in interest; and where one or both of them have property already condemned for public use capable of subserving the same public end and purpose, the Court would refuse to condemn the property of a private person, and destroy home and business of private citizens for such alleged public purpose.

"Exception twenty-second. The Court erred in not holding that the defendant company is a mere 'holding corporation' for the benefit of the Southern Railway Co. and the Atlantic Coast Line Railroad Co., and in this case is bound by the equities that control either or both of these railroad corporations.

"Exception twenty-third.   The Court erred in holding
as follows: 'Counsel for the defendant, in the course of
argument, moved that certain testimony of Mr. John Riley,
in relation to the introduction of the bill to incorporate the
defendant, be stricken out.   The motion is granted, and it is
so ordered.'   On the ground:

"1. That the defendant having at the time of giving said
testimony objected only to a portion thereof, cannot move
thereafter to strike it all out.

"2. On the ground that the defendant having cross-exam-
ined Mr. Riley fully on the same matters objected to, is
estoppel to move to strike it out.

"3. That the testimony is relevant to the issues.

"Exception twenty-fourth.   The Court erred in dismiss-
ing the complaint herein, and not decreeing the injunction as
prayed in the complaint."

*Messrs. Bryan & Bryan*, for appellants, cite: *The act
incorporating the station company is repugnant to the 14th
amendment of the U. S. Con.:* 177 U. S., 230; 182 U. S.,
437; 160 U. S., 389; 2 Lewis on Em. Dom., 892, 893, 894-5;
9 Rich., 228; 10 Ency., 1050-1, 1054, 1057, 1068, 1069.
*And is repugnant to art. III., sec. 5, of our Con.:* 2 Rich.,
228; 38 S. C., 308; 63 S. C., 199, 348.   *Special law is
unconstitutional here:* 59 S. C., 114; 1 Mor. on Corp., 2 ed.,
sec. 433; Noyes on Inter Rel., secs. 266-268; 103 Ala., 627;
31 N. J. Eq., 494; 104 N. Y., 1; 125 Mo., 444; 72 N. Y.,
245.   *The preliminary question is the necessity for the
taking:* 9 Rich., 228; 9 Rich. Eq., 239; 2 Lew. Em. Dom.,
2 ed., 892, 894; 81 N. C., 437.   *Who authorized to con-
demn—necessity for taking:* 48 N. W., 248; 43 N. Y., 145;
21 W. Va., 534; 10 Ency. P. & P., 1064; 64 Cal., 123; 52
Md., 36.   *Defendant company is bound by the equity and
principle controlling its constituents:* 193 U. S., 358; 156
Ill., 491; 121 N. Y., 615; 23 Wend., 193; 49 Ohio, 177; 50
N. J. Eq., 74; 155 Ill., 179.

*Messrs. Jos. W. Barnwell, W. Huger Fitzsimons* and *P. H. Gadsden,* contra, cite: *Circuit Judge did not mean to say that 14th amend. to Con. of U. S. could not apply to condemnation here:* 98 U. S., 403. *As to public use:* 68 Am. Dec., 650; 77 N. Y., 248. *Act of incorporation is not unconstitutional because it relates to more than one subject:* 23 S. C., 434; 96 U. S., 315. *Plaintiff cannot attack organization of the company in this proceeding:* 9 Ang. & Aimes on Corp., sec. 94; 19 S. E. R., 646; 70 Ky., 635. *The necessity for condemning the lands:* 2 Rich., 434; 9 Rich., 228; Lewis on Em. Dom., sec. 394; 46 N. Y., 346; 10 Ency., 2 ed., 1057; 80 Ky., 259; 109 Ill., 237; 6 Vroom, 546. *One corporation holding stock in another does not merge it:* 77 N. Y., 149; 6 Ency., 2 ed., 802, note 1.

April 18, 1905. The opinion of the Court was delivered by

MR. JUSTICE JONES. This is an action for a perpetual injunction against condemnation proceedings instituted by the Charleston Union Station Co., under an alleged power contained in the act of the General Assembly incorporating the defendant company, approved February 20th, 1902, 23d Stat., 1168. The decree of the Circuit Court, reported herewith, refused injunction, and dismissed the complaint, after a full and able consideration of the questions presented. The plaintiffs appeal upon exceptions, reported in full herewith, which, without further statement, we proceed to consider.

The first, second, fourth and fifth exceptions make the point that the act under which the defendant seeks to condemn plaintiffs' property is unconstitutional in that no tribunal is provided for the determination of any question that may be made by the land owner as to the right and power of the defendant company to take plaintiffs' property. This contention cannot be sustained. While it is true, the condemnation statutes provide no special tribunal, except for the determination of the

amount of compensation to be paid, nevertheless the regular machinery of the Courts is available for the determination of any issue with respect to the right and power to condemn. *Riley* v. *Union Station Co.,* 67 S. C., 93, 45 S. E., 149. The remedy provided by the condemnation statute is exclusive only as to matters falling within its provisions. These statutes, in conjunction with the general law, provide for full hearing before a lawful tribunal after due notice, and thus answer every requirement of the Federal and State Constitutions, with reference to due process of law. A sufficient answer to appellants' contention in this regard is the fact that in these proceedings they have rightfully invoked the machinery of the court of equity to determine the issues which they have raised, have had full trial thereon, and now are having the same reviewed by this Court.

The second specification of the second exception objects to that portion of the decree of the Circuit Court wherein the Court said, "Nor are the provisions of the fourteenth amendment of the Constitution of the United States violated. One of the attributes of State sovereignty is the right of eminent domain, the right of providing for the taking of private property for public uses. Each State, by virtue of its Statehood, has the right to exercise the power of eminent domain. This is doubted nowhere, and the provisions of the Federal Constitution do not relate to the eminent domain of the State." Appellants' ground of objection is that the provisions of the Federal Constitution, and particularly the fourteenth amendment, do relate to and control the law of eminent domain of South Carolina. The exception puts an erroneous interpretation on the meaning of the Circuit Judge. The objectionable language was in the quotation from 10 Ency. Law, 2d ed., 1052, which was based upon *Barron* v. *Baltimore,* 7 Pet., 243. The case cited was decided in 1833, and related to the *fifth* amendment, declaring that private property shall not be taken for public use without just compensation, which the Court said was intended solely as a limitation on the exercise of the power

of the Federal government, and was not applicable to legislation of the States.   Judge Dantzler did not intend to say that the provisions of the fourteenth amendment had no relation to the exercise of eminent domain by the State, but that such amendment was not _violated_ by the statutes in question, as he proceeds to show that the condemnation proposed was for a public use, and that the statutes made ample provision for the protection of property owners and for compensation for property so condemned.

The third exception imputes error in holding that the property sought to be condemned is for public use; whereas, the facts show that it is to be taken for private use, in violation of art. I., sec. 17, State Constitution.   This exception cannot be sustained.   The defendant company was incorporated for the purpose of constructing, maintaining and operating a union passenger station in the city of Charleston, and, to this end, was given the right to acquire, by purchase, lease or condemnation, all property necessary for the same, and to have the general powers and to be subject to the general restrictions imposed by law upon railroad corporations.   By section 3, power was given to acquire such real estate as may be necessary to construct, maintain and operate a union passenger station, comprising passenger depots, office buildings, sheds, storage rooms and yards; also main and side tracks, switches, crossovers, turnouts, bridges and other terminal railroad facilities, appurtenances and accommodations suitable in size, location and manner of construction, to perform promptly and efficiently the work of receiving, delivering and transferring all passengers, baggage and mail and express matter of railroad companies using said station, etc., with power to condemn lands for such purpose, under sections 1743 to 1755, Revised Statutes, 1893, and amendatory statutes.

If defendant company is not, in fact, a railroad company, its main purposes are clearly within the objects of a regular railroad company, and it is so closely analogous thereto as to warrant the Court in applying to it the same rule that would

be applied to a regular railroad corporation in determining whether the property sought to be condemned is for a public use.

If it should be conceded that the use of a union passenger station is private, appellant would have to reckon with the case of *Boyd* v. *Granite Co.*, 66 S. C., 433, 440, 45 S. E., 10, which, construing art. I., sec. 17, art. XVII., with art. IX., secs. , 2 and 20, holds: "That private property shall not be taken for private use without the consent of the owner, except in cases where this power is conferred upon corporations by the General Assembly, and then only in the manner prescribed in sec. 20, art. IX."

The first general principle which must control this question is, when the legislature, in effect, declares that the construction, maintenance and operation of the union passenger station in the city of Charleston is a public purpose so as to authorize the condemnation of property, this conclusion is binding on the Court if there be any reasonable ground to support it. *Chicago & Northwestern Ry. Co.* v. *Morehouse,* 112 Wis., 7; 88 Am. St. Rep., 918. But independent of the implication from the statute chartering the defendant company that the use is a public one, there is no room to doubt, from the testimony, that a union passenger station with appurtenant facilities in the city of Charleston would be a great and direct benefit to the traveling public. It is not easy to give a definition of public use which will be adequate to cover every case that may properly fall within the terms, and this case does not call for an attempt to define the terms. Some cases take the very broad view that "public use" is synonymouse with "public benefit." A more restricted view, however, would seem to better comport with the due protection of private property against spoliation under the guise of eminent domain. Judge Cooley, in his Constitutional Limitations, 654, says: "The public use implies possession, occupation and enjoyment of the land by the public at large or by public agencies; and the due protection of the rights of private property will preclude the government from seizing it

in the hands of the owner, and turning it over to another on vague grounds of public benefit, to spring from a more profitable use to which the latter will devote it." In Lewis on Eminent Domain, sec. 165, it is said that "public use" means the same as "use by the public." These definitions involve the idea that the public must have a definite and fixed use of the property to be condemned, independent of the will of the person or corporation taking title under condemnation, and that such use by the public is protected by law. *Fallisburg Power & Mfg. Co.* v. *Alexander,* 101 Va., 98; 99 Am. St. Rep., 855. The case of *Healy Lumber Co.* v. *Morris,* 33 Wash., 490; 99 Am. St. Rep., 964, holds that "a public use must be either a use by the public or by some *quasi* public agency and not simply a use which may incidentally or indirectly promote the public interest or general prosperity." If we accept either of these views of the meaning of "public use," the defendant company is clearly chartered for a public purpose, and the condemnation of property for the construction, maintenance and operation of a union passenger station in the city of Charleston is for a public use. No one doubts now that the laying of railroad tracks and the erection of depots by a regularly chartered railroad company is for such public use as to justify the exercise of eminent domain under the condemnation statutes. This franchise is, in its nature, as public as a franchise to transport passengers for hire. The defendant company is designed to carry out the same public use by affecting such a public utility as a union passenger station, involving the necessary railroad tracks, depots and terminal facilities for accommodation of the public. The public, independent of the will of the defendant, and protected by law, has a fixed and definite right to use this station in dealing with the defendant company, or the railroad companies using the station in their business as common carriers of passengers.

The fact that the Southern Railway Co. and the Atlantic Coast Line Railroad Co. are the principal stockholders in the defendant company and the officers of the defendant

company are officers in said railroad companies cannot affect
this question, for the use is still a public use, whether con-
sidered with reference to the defendant company or with
reference to the stockholding companies, as these railroad
companies, as common carriers, are public agencies, and it is
within the purpose of their organization to own or control
depot facilities required for their business and the needs of
the community. Nor is the question whether the use is a
public use at all affected by the alleged fact that each of the
railroad companies holding stock in the defendant company
has one or more sites of its own said to be suitable for a union
passenger station. The question whether the use is public
depends upon the nature of the use and not upon the posses-
sions of the particular individuals or corporations that may
be interested in such use. Whether the last mentioned fact
influences the question whether there is a *necessity* for con-
demning plaintiff's property belongs more properly to the
consideration of other exceptions to be hereafter noticed.

The sixth exception raises the point that the act incor-
porating the defendant company violates sec. 7, art. III., of
the State Constitution, in that it relates to more than one sub-
ject expressed in its title, since it not only incor-
porated the defendant company, but amended the
existing charters of the Atlantic Coast Line Railroad
and the Southern Railway by a special law and not by a gene-
ral law, which is forbidden by art. IX., sec. 2, of the
Constitution. The title of the act is to incorporate the
"Charleston Union Station Company," but in sec. 5, the
statute gives the power to subscribe for and hold the stock
and to guarantee and hold the bonds of the defendant com-
pany. The case of *Connor* v. *Railroad*, 23 S. C., 427, holds
that: "An act to incorporate the Green Pond, Walterboro and
Branchville Railroad Company" does not relate to more than
one subject expressed in its title, because of the fact that the
act also authorized the county of Colleton to subscribe to the
capital stock. The principle upon which the case rests is "that
when an act of the legislature expresses in its title the object

of the act, the title embraces and expresses any lawful means
to achieve the object." *San Antonio* v. *Mehaffy,* 96 U. S.,
315. When the creation of a corporation is the subject, it
necessarily includes the powers to be given it. *Ex parte
Bacot,* 36 S. C., 135, 15 S. E., 204. Among the powers
granted was the right to sell its stock and bonds to the
railroad companies entering the city of Charleston and using
said station. But while the principle is admitted, it is con-
tended that it does not apply here, because the act incor-
porating the defendant company was a special act containing
an amendment to the charters of said railroad companies in
the particulars mentioned, contrary to art. IX., sec. 2, of the
Constitution, which provides: "The General Assembly shall
provide by general law for the changing or amending
existing charters;" and in view of this last named clause of
the Constitution, adopted since *Connor* v. *R. R. Co.. supra,*
was decided, the said amendatory provisions constitute a
subject not embraced in the title. This question will be
necessarily involved in the consideration of the seventh and
eighth exceptions, which raise the question that the act incor-
porating the defendant company violates art. IX., sec. 2,
quoted above, and also art. III., sec. 34, which prohibits a
special law when a general law can be made applicable.

The Circuit Court has disposed of this question very con-
clusively by construing these provisions of the Constitution
together. Sec. 2, art IX., of the Constitution, quoted in
full, is as follows: "No charter of incorporation shall be
granted, changed or amended by special law except in the
case of such charitable, educational, penal or reformatory
corporations as may be under the control of the State or may
be provided for in this Constitution, but the General Assem-
bly shall provide, by general laws, for changing or amending
existing charters, and for the organization of all corporations
hereafter to be created, and any such law so passed. as well
as all charters now existing or hereafter created, shall be
subject to future repeal or alteration: *Provided,* That the
General Assembly may, by a two-thirds vote of each house,

on a concurrent resolution, allow a bill for a special charter to be introduced, and when so introduced may be passed the same as other bills." The above *proviso* clearly makes an exception to the general rule forbidding a special law when a general law can be made applicable, by providing that a special charter may be granted under the conditions named. In this case, the conditions exist, and the statute recites the fact that a concurrent resolution allowing the bill to be introduced has been passed by a two-thirds vote of each house, as required by statute.

The ninth and tenth exceptions allege error in not holding that defendant company is not duly incorporated, organized and authorized to commence business under the terms of the act of corporation, because the act authorized the company to organize and commence business when $50,000 had been subscribed to the capital stock, the evidence shows that nine-tenths thereof is invalid stock subscriptions of Southern Railway Co. and Atlantic Coast Line Railroad Co., such invalidity resting in the contention that the special act incorporating the company is void, under sec. 2, art. IX., of the Constitution. This contention has been overruled in the consideration of the seventh and eighth exceptions above.

The eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth exceptions bring up the question of fact, whether the property sought to be condemned is neecssary for the purposes of the corporation. The case of *S. C. R. R. Co.* v. *Blake,* 9th Rich., 228, shows that the grantee of the power to condemn lands is not the sole judge whether any particular parcel of land is required for the purposes of the road, and that the final determination of this question rests with the Courts. This is in accord with many authorities cited in 88 Am. St. Rep., 946, note. Nevertheless, it is right that weight should be given to the fact that the grantee to whom the statute has delegated the power to condemn has decided that the particular land in question is required. As said in *Smith* v. *R. R. Co.,* 105 Ill., 511, and repeated in *O'Hare* v.

*Chicago etc. R. R. Co.* (Ill.), 28 N. E. Rep., 923, 925:
"Every company seeking to condemn land for public im-
provement must, in a modified degree, be permitted to judge.
for itself as to what amount is necessary for such purpose."
This right, however, is subordinate to the right of the Courts
to prevent an abuse of the power by restricting its exercise
to the reasonable necessities of the case, since to take more
than reasonable necessity requires is to appropriate private
property to private use."

We have carefully considered the testimony in view of
these principles and see no just ground for overruling the
decision of the Circuit Court that such reasonable necessity
exists. It is strenuously contended by appellant that no
reasonable necessity exists, because the testimony shows that
the Southern Railway Co. and the Atlantic Coast Line Rail-
road Co., holding the greater portion of the capital stock of
the defendant company, each have lots suitable for the erec-
tion thereon of a union station, and that equity and good con-
science would not allow these companies associated under
the name of the Charleston Union Station Co. to condemn
the property of plaintiff for said purposes.

In a proper case the court of equity would undoubtedly
look beyond the corporate entity to its constituent stock-
holders as the real parties in interest, associated under the
name of the corporation. But we find nothing in this
case which calls upon this Court to ignore the rights
of defendant as a corporation to condemn the lands
of others for a public use, founded in reasonable necessity.
So far as appears, the defendant company owns no property
which it may use for the purpose named. It would be a bold
and far-reaching doctrine to announce that no *quasi* corpora-
tion could condemn property of a non-stockholder for public
use as long as any stockholder had property which might be
used for the purpose. Such a rule would lead the Court into
an impenetrable maze to ascertain and adjust the rights and
claims of the various stockholders as to whose property
should be taken and whose left. The safer rule is that the

grantee of the power to condemn must not abuse the discretion confided by the legislature and spoliate private property by taking, for pretended public use, more than a reasonable necessity requires.    We find no abuse of discretion or bad faith in defendant's proposal to condemn plaintiffs' property, and the general rule is that if there be no bad faith or abuse of discretion on the part of the grantee in the matter of location, his discretion will not be interfered with.    10 Ency. Law, 2 ed., 1057, and cases cited in note 1.    A somewhat similar contention was made in *Kansas and Texas Coal Ry.* v. *Northwestern Coal & Mining Co.*, 161 Mo., 288, 84 Am. St. Rep., 722, and was overruled by the Court.    We do not find in the case anything to warrant a conclusion that the organization of the defendant company is a scheme by the Southern Railway Co. and the Atlantic Coast Line Railroad to do something which they could not lawfully do under their own chartered powers.    They have become stockholders in defendant company by authority of a valid act of the legislature, and the plan of organizing the defendant company for the purpose of securing an important public utility in the line of their own chartered purpose has legislative sanction.    The case presented has no similarity to the Northern Securities case, 193 U. S., 358, and other cases on that line relied on by appellants, relating to combinations in restraint of trade, in violation of anti-trust legislation.    These conclusions also require that the twentieth, twenty-first and twenty-second exceptions be overruled.

The twenty-third exception, relating to striking out all the testimony of Mr. John Riley in reference to the introduction of the bill to incorporate the defendant, is untenable.

The purport of the testimony was that Mr. Riley received no personal notice of the introduction of the bill in the Senate, and thus had no opportunity to attempt to have the bill amended in the Senate, by striking out the condemnation clause, although he knew, from the newspapers, of the passage of the resolution authorizing the introduction of the bill, and as a matter of fact was heard by

the house committee in opposition to the bill.    The ruling
of the Circuit Court was quite proper.    The testimony was
wholly irrelevant to any issue in the case, and even if it had
been permitted to remain as a part of the record, it could be
of no consequence in affecting the result of this case.

We find no error in refusing injunction sought and in dis-
missing the complaint.

The judgment of the Circuit Court is affirmed.