17934

Foster H. YOUNG and Mrs. Hessie B. McLaughlin, Individually and as Trustee of the Estate of S. T. Burch, Respondents, v. J. B. WIGGINS, A. L. Manwiller, E. J. Ratliff, Foster Jeffords, and Edward L. Young, Individually and as directors and officers of Ebenezer Community Watershed Conservation District; and W. D. Boling, F. E. Weaver, T. W. Williamson, Keith Jordan and J. B. Cook, as officers and supervisors of Florence Soil Conservation District, Appellants.

(126 S. E. (2d) 360)

*Messrs. Dusenbury, Dusenbury & McKenzie,* of Florence, *for Appellants,*

*Messrs. Willcox, Hardee, Houck & Palmer* and *Mc-Eachin, Townsend & Zeigler,* of Florence, *for Respondents,*

June 15, 1962.

BRAILSFORD, Justice.

This is an action to enjoin the directors of Ebenezer Community Watershed District from condemning certain lands belonging to plaintiffs. After a full hearing, an injunction was granted by the circuit court, upon the ground that the proposed taking was not for a public use. This appeal by the directors of the district followed.

The district was organized as a subdistrict of the Florence Soil Conservation District under a special act of the General Assembly, No. 1085 for 1958. 50 St. at Large, p. 2344. The circuit court found that the procedures required for the organization of the district, including certain findings by the board of supervisors of the Florence Soil Conservation Dis-

trict, a referendum, and the election of a board of directors for the district, had been complied with.

Under the terms of the Act, the approval of the board of supervisors of the Soil Conservation District was required before the board of directors of the Watershed District could lawfully institute condemnation proceedings. A certificate of approval was circulated among the members of the board and was signed by each member at his residence or place of business. Condemnation notices were issued and served on the basis of this certificate. The circuit court held that this "individual action of the members of the board of supervisors was not official and could not constitute the approval contemplated by Act No. 1085 for commencement of condemnation proceedings." Recognizing that this deficiency might be cured and the litigation renewed, the court chose to rest the injunction on its finding of no public use, thereby resolving the controversy on the merits.

The conclusion that there was no effective approval of condemnation by the board of supervisors is not challenged on this appeal. Therefore, the law of this case establishes that the condemnation proceedings were prematurely instituted. However, we will not dismiss the appeal on this ground, without reviewing the decision of the circuit court on the issue of whether the proposed taking is for public use.

The Act authorized the organization of the district "for the purpose of developing and executing plans and programs relating to any phase of conservation of water, water usage, flood prevention, flood control, erosion prevention and control of erosion, flood-water and sediment damages."

The Act specified that the district should include "all lands abounding on the Run of Middle Swamp from, but not including, the property of J. W. Parker, Jr., on the upper end, and extending to, but not including, property of J. W. Parker, Sr., on the lower end."

This area is devoted primarily to agriculture. However, it is near the City of Florence and the testimony establishes that its potential value for suburban residential development far exceeds its agricultural value.

Prior to the passage of the Act, certain landowners, including Edward L. Young and Jesse B. Wiggins, became interested in creating a large lake by damming up Middle Swamp. They enlisted the assistance of the personnel of the soil conservation service, and undertook to secure the cooperation of other affected landowners. Apparently, most of these readily consented to the flooding of their swamp lands, and agreed to cooperate in a real estate development, by which it was proposed to finance the project. So far as practicable, the area of the proposed lake was restricted to exclude objecting landowners. Thus restricted, the proposed lake would flood some 250 acres, including about twenty acres belonging to the plaintiff, F. H. Young, hereafter referred to as Dr. Young, on the upper or western end, and about ten acres belonging to the plaintiff, Hessie B. McLaughlin, as trustee, on the lower or eastern end.

In June, 1957, E. L. Young and J. B. Wiggins, accompanied by Albert Cole of the soil conservation service, approached Dr. Young in an effort to enlist his cooperation in the lake project. Its value to the landowners as a source of water for irrigation and from the standpoint of real estate development was put forward. When he dissented, it was suggested that legislation granting the power of condemnation would be sought "if the landowners involved would not cooperate."

After the organization of the district, Messrs. Bernard D. Dusenbury and Richard G. Dusenbury, acting as attorneys for the directors and interested landowners, made a further effort to obtain Dr. Young's participation in the lake project. Alternative proposals were made in a letter dated May 16, 1959, both of which featured the organization of a "development corporation, probably wholly owned by the par-

ticipating landowners." It was estimated that lake front lots could be sold for over one-half million dollars, which would far exceed the total cost of development. It was suggested that Dr. Young either "participate fully with all of the other landowners"; or grant necessary easements for the flooding of his land and the construction of a road "approximately 250 to 300 feet behind the flood line," and accept conforming restrictions on the use of his property "to apply only if and when (he) should ever decide to subdivide (his) land or to sell it."

When this offer was rejected by Dr. Young and when Mrs. McLaughlin refused to participate, application was made to the board of supervisors of the soil conservation district for approval of condemnation. This petition stated that all of the property owners in the district, except Dr. Young and the heirs of the Sebe Burch estate (represented by Mrs. McLaughlin, as trustee) had agreed "that it would be in the best interest of all concerned" to construct the proposed lake; that all possible means of acquiring "permissive easements" as to the required Young and Burch lands had been exhausted; and that the "aims and objectives" of the district could be accomplished only by invoking the power of eminent domain.

The findings of the board of supervisors, in approving the organization of the district, were, substantially in the language of the Act, as follows:

"(a) That there is a need in the interest of the public health, safety and welfare, for the creation of the district sought in the within petition, * * *.

"(b) The operation of said district within the proposed boundaries with the power conferred upon such districts by law is administratively practicable and feasible."

The testimony on which these findings were based related principally to the feasibility of establishing the lake and the benefits which would accrue to farmers who used its water for irrigation of their crops. In addition,

there was some testimony that the impounding of water over the swamp area would be an aid to mosquito control. No testimony was required by the Act, or offered, in support of the application for approval of condemnation.

The testimony before the circuit court, tending to support the exercise of eminent domain, was of the same tenor as that previously taken before the board of supervisors. As to mosquito control, the circuit judge found that no health problem was involved which would justify the condemnation of private property. This finding was not challenged by exception. Our inquiry is thus limited to whether the impounding of water for the agricultural benefit of those who own lands bounding on the proposed lake is for public use within the meaning of Section 17 of Art. I of our State Constitution, which is as follows:

"Private property shall not be taken for private use without the conent of the owner, nor for public use without just compensation being first made therefor."

This provision was construed in *Riley v. Charleston Union Station Company*, 71 S. C. 457, 51 S. E. 485, from which we quote:

"Some cases take the very broad view that 'public use' is synonymous with 'public benefit.' A more restricted view, however, would seem to better comport with the due protection of private property against spoliation under the guise of eminent domain. * * * 'public use' means the same as 'use by the public.' "

This interpretation gives effect to the plain meaning of the constitutional limitation on the taking of private property without the owner's consent, and has been adhered to in this jurisdiction. We quote from *Bookhart v. Central Electric Power Co-op.*, 219 S. C. 414, 65 S. E. (2d) 781, 788:

"Appellant attacked in argument the authority of *Boyd v. Winnsboro Granite Co.*, 66 S. C. 433, 45 S. E. 10, and with the criticism we are inclined to agree. However, the statement of the rule there was tempered in the subsequent

decision of *Riley v. Charleston Union Station Co., supra,* 71 S. C. 457, 51 S. E. 485, 110 Am. St. Rep. 579, which was a well-considered case, and the apparently generally abandoned theory of 'public benefit' as justifying the exercise of the power of eminent domain was not followed; nor do we need to follow it here, if we were so disposed. Public benefit and public use are not synonymous in the better and more clearly constitutional view. We think that the latter (public use) is necessary for the constitutional exercise of the power of eminent domain."

And from *Edens v. City of Columbia,* 228 S. C. 563, 91 S. E. (2d) 280:

"Our controlling decisions are to the effect that 'public use' means just that and private property cannot be taken except for public use, without the consent of the owner."

Comparing this rule with that obtaining in some jurisdictions, the court said:

"In still other states the power of eminent domain may be exercised for a public purpose, benefit or the public welfare, as contrasted with the requirement of our constitution that it be for a public use."

The proposed lake was conceived as a private project, to be accomplished by private treaty among neighboring landowners, for their private benefit. The organization of the district did not change the essential nature of the project.

The watershed of Middle Swamp comprises more than 20,000 acres, 10,600 acres of which lie above the proposed dam site. The organized district includes less than 1800 acres, of which some 250 acres are in the proposed lake bed.

If constructed, the lake will be surrounded by privately owned property, with no provision for access or use by other landowners in the watershed or by the public. This is illustrated by the situation of the farm on which E. L. Young resides. It is within the watershed and in close proximity to the proposed lake, from which it is separated by property

of one Bateman. It was excluded from the organized district because Young would have no access to the lake, for the use of this farm, without Bateman's permission.

It is of no legal significance that the organized district involves some twenty landowners. The constitutional prohibition applies to the same extent as though there were only three owners, of whom two favored the lake and one opposed it. The character of the use, whether by individuals or by members of the public, rather than the numbers of users, is controlling. 18 Am. Jur., Eminent Domain, Sec. 40, *et sequa.*

Quite properly, appellants do not rely upon irrigation cases decided by the courts of western states having large arid areas. Some of these cases support the right to invoke eminent domain to obtain irrigation facilities for one or more individuals. However, they are based on special constitutional provisions or peculiar local conditions, and are not applicable here. *Clark v. Nash,* 198 U. S. 361, 25 S. Ct. 676, 49 L. Ed. 1085.

Appellants do rely upon *Dillon Catfish Drainage District v. Bank of Dillon,* 143 S. C. 178, 141 S. E. 274, in which the constitutionality of a general drainage act, under which the district had been organized, was upheld. This act was passed after the adoption in 1900 of Art. I of Amendments to the Constitution, directing the General Assembly to provide by law for the condemnation of lands necessary for the drainage of swamp and low lands of the State. The right of the district to invoke the power of eminent domain was not challenged.

We do not hold that the conservation of water and its distribution for purposes of irrigation may not be for a public use. We do hold that the attempted taking involved in this case is for private use and, therefore, prohibited. Nothing in the *Dillon Catfish case* is inconsistent with this conclusion.

The finding required by the Act, as a condition of the organization of the district, was of need in the interest of public welfare. This is not equivalent to a finding that the lake project is for public use. Nevertheless, we have assumed that a legislative finding of public use is to be implied, and have recognized that such a finding is binding, if there be any reasonable ground to support it. Finding none, we apply the rule that existence of public use is "ultimately a judicial question and, when contested, is the responsibility of the court to decide * * *." *Edens v. City of Columbia,* 228 S. C. 563, 91 S. E. (2d) 280. While we sympathize with the desires of appellants to build the proposed lake, the following quotation from Justice Kent in *Bangor & P. R. Co. v. McComb,* 60 Me. 290, is sound, as well as colorful:

"This exercise of the right of eminent domain is, in its nature, in derogation of the great and fundamental principle of all constitutional governments, which secures to every individual the right to acquire, possess, and defend property. As between individuals, no necessity, however great, * * * no refusal, however unneighborly, no obstinacy, however unreasonable, no offers of compensation, however extravagant, can compel or require any man to part with an inch of his estate."

Respondents' additional sustaining grounds need not be considered.

Affirmed.

TAYLOR, C. J., and Moss, LEWIS and BUSSEY, JJ., concur.