John Atherton MILLER, Individually and as a Representative of all the Citizens and Taxpayers of the City of Louisville, Kentucky, Appellant,

v.

CITY OF LOUISVILLE, Appellee.

Court of Appeals of Kentucky.

Feb. 20, 1959.

Leo T. Wolford, Louisville, for appellant.

William E. Berry, Wyatt, Grafton & Grafton, Cornelius W. Grafton, Louisville, for appellee.

Jo M. Ferguson, Atty. Gen., as amicus curiae.

MILLIKEN, Judge.

The constitutionality of our urban renewal and urban development statutes, KRS Chapter 99, is at stake here.

As stated in the City's brief, "The meat of the case is around the bone of urban redevelopment and urban renewal—whether these are proper objectives of government, whether tax moneys may be spent for them, whether the power of eminent domain may be brought to bear in furtherance of them, and whether the statutes attempt improper delegation of legislative power."

This case specifically presents the question of the validity of the City of Louisville's $5,000,000 "Voted Medical Center, Civic Center, and Urban Redevelopment and Urban Renewal Bonds." The City of Louisville (hereinafter called the City) contends that the bonds will be valid obligations of the City. The appellant, John Atherton Miller, for himself and for all citizens and taxpayers of the City, contends that the bonds will not be legal obligations of the City.

In the complaint, the City has set forth the facts concerning the actions taken by the Board of Aldermen, and has filed exhibits which are referred to in the complaint. The appellant, Miller, does not raise any question concerning the facts stated in the complaint or the accuracy or correctness of these exhibits.

On August 13, 1957, the City's Board of Aldermen passed an ordinance determining that it was necessary for the City to incur the indebtedness of $5,000,000, and. ordered an election to be held for the authorization of the bond issue. This ordinance was regularly advertised in a daily newspaper. The election provided for in. the ordinance was held on November 5,.

1957, on a regular election day, and the question of the bond issue was submitted to the voters. The votes cast were 38,941 in favor of the bonds, and 10,004 against the bonds. On August 12, 1958, the City's Board of Aldermen adopted another ordinance, pursuant to the election, providing for the issuance of the bonds and this ordinance was regularly adopted. The bonds have not been issued pending approval of the courts, KRS 66.210.

The value of the taxable property in the City, estimated by the assessment made as of January 1, 1957, and the estimated assessment of January 1, 1958, was about $720,000,000. Deducting the monies accumulated in the City's Sinking Fund, the net indebtedness is less than $54,000,000. It is therefore apparent that the existing indebtedness plus the amount of the bonds to be sold will be below the constitutional maximum of 10% of the aggregate of the assessed values of property in the City as required by Kentucky Constitution, Section 158.

The City proposes to use the proceeds of the sale of the bonds for the following purposes: acquiring and preparing land for a medical center in the area of General Hospital; acquiring and preparing land for a civic center; one or more projects or programs for urban redevelopment or urban renewal, including undertakings and activities for the elimination of slums or blighted or deteriorated or deteriorating areas, and the acquisition, clearance, replanning, or rehabilitation of substandard or unsanitary areas, and the preparation of such areas for such residential, commercial, industrial, public, recreational, or other structures, works, improvements, facilities, or spaces as may be appropriate or necessary, with appurtenances. These aims are all to be accomplished in accordance with a master plan adopted by the proper planning authorities.

The City proposes to cause an "agency" to be created for the purpose of preparing the development plans, conducting public hearings thereon, acquiring lands by purchase or condemnation, grading and clearing, construction of utilities or other facilities or site improvements, and disposing of the lands by conveyance or lease to public or private bodies or individuals.

The case was fully argued in the trial court, and a judgment was entered holding that the bonds would be valid obligations of the City. However, it must be noted that this is an attempt by the City, through the medium of the declaratory judgment law, not only to ascertain whether the bonds will be valid but also whether any of the stated purposes for which they may be issued are unconstitutional. In other words, the City wishes to know where it stands on the overall plan before proceeding further and inevitably incurring additional expense. We believe the City is entitled to such an opinion from this Court—that there is a genuine justiciable issue presented the resolution of which will not preclude any individual litigation arising from the administration or execution of the program.

In its brief, the City asserts that "the subject of urban development and urban renewal is an urban area where rigor mortis is the heritage of streets too narrow, lots too small, access inadequate, sanitation and fire protection unthought of, space too precious to spare, and all the related health, safety and other deficiencies and unacceptabilities that grow out of such things. Neglect becomes the pattern, because an owner can have neither the incentive nor the pocketbook to improve in the middle of squalor. Mortgage money will not invest in rat holes; not even between them. Bad conditions inevitably become worse, and the unwholesomeness becomes a concern of the entire community rather than of property owners in the limited area alone."

Unlike building codes and zoning laws which create standards for future construction and urban development, the present legislation (KRS 99.330–550, as amended through 1956) permits a concerted *public* attack on the cumulative evils of the urban development of the past and provides for

*public* agencies for coping with such forces in the future.

After it had become apparent that the elimination of a slum area accomplished only part of its purpose when the area involved was no longer suitable for low cost housing, the Congress adopted the Housing Act of 1949, 42 U.S.C.A. § 1441, and following, which authorized Federal grants in aid of municipal corporations for the public elimination of slum and blighted areas under state redevelopment laws like our co-ordinate state legislation, KRS 99.330 to 99.550, as amended in 1956. That legislation contemplates the acquisition of the individual pieces of property in the designated areas either by purchase or eminent domain, the replatting or replanning of the area by the proper public authority and the subsequent sale or lease thereof to private individuals or public agencies under restrictions compelling conformity to the over-all plan. Implicit in the scheme of things is the possibility that the widening and elimination of streets, the creating of parks and playgrounds, the erection of public buildings in the area, and the enlarging of lots therein may result in the property in the area being sold or leased in the future at a financial loss to the public. It was "for the purpose of paying all or a part of the cost of acquiring land" and its redevelopment that the voters of Louisville authorized the issuance of the $5,000,-000 bonds pledging the "full faith, credit and resources" of the City.

If a redevelopment or renewal plan is carried out in conformity to the rather detailed procedural provisions set forth in the statute, the resulting cleared or "prepared" area is not given away or leased with no regard for its value, for KRS 99.450 provides that appraisals be made by independent appraisers according to the permitted re-use values of the area. If the value for the new uses permitted by the plan is less than the cost of acquisition and preparation, there is a monetary loss to be borne by the community as a whole, a substantial portion of which would be defrayed by Federal funds. The community is not authorized to go beyond acquisition and "preparation" of the land; it may not construct any new buildings for residential, industrial or commercial use contemplated by the development plan, KRS 99.360(2); but it may construct public buildings in the area.

The substance of the matter is that when the defined conditions of public evil have been eliminated and a new plan consistent with the community's pre-existing master plan has been approved, the "public uses" and "public purposes" of the Legislature have been accomplished. The community does not go beyond this point by additionally using public funds to "go into business," but then invites private enterprise to proceed with development through investment of private funds but only in strict conformity with the plan.

The validity of similar legislation has been upheld in twenty-four states and the District of Columbia, and most of the decisions may be found in an annotation to 1955, 44 A.L.R.2d 1416, and following. In December, 1958, the Supreme Courts of Indiana and Kansas upheld similar legislation. Alanel Corporation v. Indianapolis Redevelopment Commission, Ind., 154 N.E. 2d 515; McCoy v. City of Evansville, Ind., 154 N.E.2d 804; City of Kansas City, Kansas v. Robb, Kan., 332 P.2d 520. Without extended discussions of the reasons given by the courts for sustaining the validity of such statutes, suffice it to say that our attention has been called to no provisions of Kentucky law, constitutional or otherwise, which would cause us to conclude that the elimination of slum, Spahn v. Stewart, 1937, 268 Ky. 97, 103 S.W.2d 651, and blight is not a legitimate objective for the exercise of the police power of the state. Blighted area is defined by statute, KRS 99.340(2), as an area which, largely because of faulty layout, cannot be developed into an area of "predominantly housing uses;" it is a step before an area becomes a slum. The subsequent sale or lease to private users does not alter the objective. Furthermore, we see no essential difference between buy-

ing property for public purposes with tax money and condemning property or taking it by eminent domain and paying for it out of tax funds. While it is true that individual pieces of property in an affected area may be safe, sanitary and useful properties, yet their acquisition may be necessary to the accomplishment of the over-all plan. In any event, the prerequisites for the adoption of the redevelopment and renewal program are so specific and detailed —even the relocation of displaced families must be considered; they afford proper notice and hearing, KRS 99.370, as well as appeals to the courts including this Court, KRS 99.380, that sufficient safeguards appear to be provided the individual both in the courts and within the administrative agencies charged with execution of the program. The standards and safeguards set forth in the statutes preclude concluding that an improper delegation of legislative power is here involved. Spahn v. Stewart, 1937, 268 Ky. 97, 103 S.W.2d 651.

■ The appellant contends that the general laws as to zoning, abatement of nuisances and preservation of the public health confer sufficient power to deal with the type of problems presented here, and for that reason asserts that the exercise of the power of eminent domain in such a situation would not be for a public purpose. While the general rule still may be that the police power may not be exercised for aesthetic reasons, that assumption is a highly qualified one as the trend of judicial decisions indicates. 11 Am.Jur., Constitutional Law, Section 280. But there is more than an aesthetic consideration here; there is the legislative declaration of policy which is within the scope of the general health and welfare purposes of the police power. We cannot adjudge the statutory method of accomplishing that purpose illegal because it seeks to achieve the general welfare through an over-all plan rather than through unco-ordinated, piecemeal action. The aim is the same; the method alone is different. The property taken must be

paid for on the basis of its fair value under either method.

■ The sweeping legislation of the past quarter of a century—particularly in the general field of Public Administrative Law where Federal grants in aid are involved— demands a rather elastic application of Section 51 of our Constitution to the effect that "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title * * *." Designed as it was to assure consideration of the merits of proposals in the General Assembly and to prevent the enactment of "sleepers" which did not mean what the members of the Assembly thought was covered by the bill, the constitutional provision has a salutary effect. Facing the realities of the present era of lengthy legislation as we must, the title of a bill could be as long as the names of royalty if a detailed tribute to its lineage were required. The titles of the 1956 Act, Chapter 215, and of the 1958 Act, Chapter 159, under their respective wordings, "An Act relating to urban renewal projects and planning, and declaring an emergency" and "An Act relating to urban renewal," we believe, adequately apprised the General Assembly of the tenor of their copious contents as required by Section 51 of our Constitution.

■ The complained of brevity of the titles to the enabling legislation is in inverse proportion to the length of the question submitted to the electorate for its approval. The real issue before the public was whether it wanted to incur a $5,000,-000 municipal indebtedness for the general purpose of urban renewal and redevelopment. The question presented the salient facts to the voters in such a way that there was little chance for the patient and thoughtful voter to be misled. If other voters were misled, it was not the question which did it. The question on the ballot was:

"Bonds For Acquiring And Preparing Land For A Medical Center And A

Civic Center, And For Urban Redevelopment Or Urban Renewal.

"Shall the City of Louisville incur an indebtedness and issue and sell its bonds therefor in the amount of Five Million Dollars ($5,000,000.00) as provided in Ordinance No. 180, Series 1957, for the purpose of paying all or a part of the cost of acquiring and preparing land for a medical center in the area of General Hospital and of acquiring and preparing land for a civic center, all in accordance with a master plan approved by the planning commission of the City, with or without redevelopment or renewal under pertinent laws of the United States or the Commonwealth of Kentucky, *and of one or more projects or programs for urban redevelopment or urban renewal or any combination thereof, including undertakings and activities for the elimination (and to prevent development or spreading) of slums or blighted or deteriorated or deteriorating areas, and the acquisition, clearance, replanning or rehabilitation of substandard or unsanitary areas, and the preparation of such areas for such residential, commercial, industrial, public, recreational or other structures, works, improvements, facilities or spaces as may be appropriate or necessary, with appurtenances;* such bonds to be general obligation bonds of the City for the payment of which, both principal and interest, its full faith, credit and resources will be pledged, said bonds to be paid from the levy and collection of an annual tax sufficient to pay the interest on and principal of such bonds and create a sinking fund therefor, the required amount of such annual tax being estimated by the Board of Aldermen to be a maximum of Three Hundred Fifty Thousand Dollars ($350,-000.00) ? "

We think the question states the essentials clearly. (The italicizing of a portion of the question is by the writer of this opinion and is for reference later in this opinion.)

■ The fact that the City did not advertise Ordinance No. 265, Series 1958, which provided "for the mode of creating and paying the indebtedness" authorized by the electorate at the November, 1957, regular election, is claimed to be a vital aspect in the proceedings. This ordinance referred to the mandate of the people in the aforesaid election, described the bonds and coupons to be issued, the method of sale of the bonds and the advertising therefor, and specifically declared in Section 3 thereof, "That in each year *while any of said bonds shall be outstanding* there shall be and there is hereby levied upon all property subject to taxation within said City a tax sufficient to pay the interest on said bonds as the same falls due and also to constitute a sinking fund for the payment of the principal of said bonds as the same mature, which tax shall be levied and collected at the same time and in the same manner as other taxes authorized to be levied by said City * * *." No bonds are outstanding at this time, and the ordinance directs that approval of the authorized bond issue first be procured from the courts, the very approval now sought from this Court. If it were necessary to advertise this ordinance as appellant asserts, it is obviously not too late to do it. However, we do not believe this ordinance comes within the scope of KRS 424.270, enacted in 1958, which was in effect at the time Ordinance No. 265 was adopted in August, 1958. That section of the statutes declares:

"No regulation promulgated by any officer, board or commission of a city, county or district, which is intended to impose liabilities or restrictions upon the public, shall be valid unless and until it has been advertised by newspaper publication."

We think it clear that this provision deals with the regulations of local administrative agencies and not with municipal legislative enactments of the dignity of an ordinance.

If the General Assembly had intended to include municipal ordinances, it is reasonable to assume that it would have done so specifically.

 In 1958 the General Assembly reenacted KRS 99.330 to 99.590 (Chapter 159, Acts of 1958, pages 676 to 690). Counsel for the City have favored us in Appendix G to their brief with a complete copy of the 1958 enactment with the additions to and deletions from the 1956 law italicized or bracketed, respectively. Suffice it to say that a check of those deletions and additions discloses that they are of a minor clarifying or administrative nature with the exception of the added provision extending coverage of the renewal and redevelopment program to areas in need of rehabilitation as a result of "flood, fire, hurricane, earthquake, storm or other catastrophe respecting which the Governor of the state has certified the need for disaster assistance under Public Law 875, Eighty-First Congress [42 U.S. C.A. § 1855 et seq.], or other Federal Law." These changes in the statute certainly do not vitiate the proceedings and the vote of the people of Louisville at the November, 1957, election when the 1956 Act was in effect; both versions of the germane statutes deal with urban renewal and redevelopment. A reference to the italicized portion of the question submitted to the electorate will disclose that the catastrophe provision added to the statute by the 1958 General Assembly does not widen the scope of the over-all program submitted to the people of Louisville in the 1957 general election.

We have not discussed in detail the various ramifications of "renewal" "redevelopment," "slum" and "blight" as developed so ably by counsel in their briefs, but conclude, as heretofore indicated, that the $5,000,000 bond issue is valid, that the bonds may be sold, and that the proceeds thereof may be devoted to the uses contemplated in the statutes involved, including the 1958 amendments thereto. Specific questions which may arise in the future in the execution and administration of the over-all plan may, of course, be determined as they arise.

We thank counsel for their excellent presentation of the many problems foreseen and discussed.

The judgment is affirmed.