[No. 35982. En Banc. February 1, 1963.]

VICTOR J. MILLER, *Appellant*, v. THE CITY OF TACOMA, *Respondent.**

*Reported in 378 P. (2d) 464.

*Comfort, Dolack & Hansler* (*Robert A. Comfort*, of counsel), for appellant.

*Marshall McCormick, Robert R. Hamilton, Thomas C. Lowry, Ronald E. Thompson,* and *Edward J. Guenther,* for respondent.

WEAVER J.—Plaintiff, a resident and taxpayer of Tacoma, Washington, is the owner of real property "improved and enhanced with a valuable house which is a good, sound, sanitary, modern and well-kept building." The house is within the boundaries of the Center Street Urban Renewal Project. He initiated this action on behalf of himself, and others similarly situated, for a declaratory judgment (RCW 7.24) to challenge the constitutionality of RCW 35.81 (Laws of 1957, chapter 42, as amended by Laws of 1959, chapter 79), known as the "Urban Renewal Law," RCW 35.81.910. Plaintiff sought injunctive relief, enjoining the city of Tacoma from taking action under the questioned statutes. The attorney general of the state was served with process, as required by RCW 7.24.110.

Both parties moved for summary judgment. The trial court, having found the land area in question " . . . con-

stitutes a menace, to the public health, safety, welfare, and morals in its present condition and use . . . ," held the statutes constitutional; hence, defendant's motion for summary judgment was granted.

Plaintiff appeals from a judgment dismissing his action with prejudice.

There emerges, after a survey of the many decisions in this field of law, a general statutory scheme that divides itself into three categories: first, statutes providing for slum clearance and rehabilitation; second, statutes for the elimination and renewal of "blighted areas" in municipalities of the state; and third, statutes for the establishment of industrial development districts and public acquisition of "marginal lands" for that purpose. The statutes of each category have characteristics and attributes common to the others.

The questioned statutes applicable to the instant case are really a combination of the first two categories—slum clearance and urban renewal; their constitutionality is a question of first impression in this jurisdiction.

The unconstitutionality of the statutes in the third category—the establishment of industrial development districts to " . . . devote it [land] to what it considers a higher and better economic use . . ."—was, after two en banc arguments to this court, exhaustively researched, discussed, and established in *Hogue v. Port of Seattle,* 54 Wn. (2d) 799, 341 P. (2d) 171 (1959).

Our decision in the *Hogue* case expressly distinguishes the statutes then before the court from those of the instant case. We said:

"These lands are not being acquired to eliminate a slum or blighted area, or to destroy conditions that breed crime or disease, or to remove buildings that are dilapidated and dangerous to the occupants and the public; nor are they even being acquired to cure any of the ten conditions which purportedly cause them to be marginal lands. (See § 3 of the act.) The only 'cure' suggested in the 1955 act is to permanently deprive the landowner of his land because he has a flaw in his title, or his lot boundaries are not rectangular, or because his land has some other alleged defect described in § 3.

"The evidence conclusively shows that the Port's real purpose is to acquire these lands (with the proceeds of the two-mill levy) in order to provide potential industrial sites for future use by persons, firms or corporations engaged in business for profit who may desire to establish factories, warehouses, machine shops or other industrial enterprises in the area.

"Thus, the basis for acquiring this property by eminent domain really rests upon the theory that the Port can condemn this fully developed agricultural and residential land because the Port can devote it to what it considers a higher and better economic use (to sell it as industrial sites). [pp. 826-7]

" . . .

" . . . Our examination of resolution No. 1814 convinces us that its primary purpose is industrial development, which is a private purpose." (p. 834)

The Congress of the United States has enacted legislation authorizing the Housing and Home Finance Administration to make grants of capital to cities for renewal or redevelopment of slum or blighted areas. See appendix, note 1.

The federal government may contribute two-thirds of the cost of the project; the balance of the cost must be paid from local funds. 42 U.S.C. 1452 (a), 1453 (a). Cities in Washington were ineligible to participate in the program until Laws of 1957, chapter 42 (RCW 35.81.010-910) were enacted.

The necessity and purpose of the Urban Renewal Law are set forth in § 2 of the act (RCW 35.81.020), as follows:

"It is hereby found and declared that blighted areas which constitute a serious and growing menace, injurious to the public health, safety, morals and welfare of the residents of the state exist in municipalities of the state; that the existence of such areas contributes substantially and increasingly to the spread of disease and crime and depreciation of property values, constitutes an economic and social liability, substantially impairs or arrests the sound growth of municipalities, retards the provision of housing accomodations, aggravates traffic problems and substantially impairs or arrests the elimination of traffic hazards and the improvement of traffic facilities; and that the prevention and elimination of such areas is a matter of state policy and state concern in order that the state and its municipalities shall

not continue to be endangered by areas which are focal centers of disease, promote juvenile delinquency, are conducive to fires, are difficult to police and to provide police protection for, and, while contributing little to the tax income of the state and its municipalities, consume an excessive proportion of its revenues because of the extra services required for police, fire, accident, hospitalization and other forms of public protection, services, and facilities.

"It is further found and declared that certain of such areas, or portions thereof, may require acquisition, clearance, and disposition subject to use restrictions, as provided in this chapter, since the prevailing condition of decay may make impracticable the reclamation of the area by rehabilitation; that other areas or portions thereof may, through the means provided in this chapter, be susceptible of rehabilitation in such a manner that the conditions and evils hereinbefore enumerated may be eliminated, remedied or prevented; and that to the extent feasible salvable blighted areas should be rehabilitated through voluntary action and the regulatory process.

"It is further found and declared that the powers conferred by this chapter are for public uses and purposes for which public money may be expended and the power of eminent domain exercised; and that the necessity in the public interest for the provisions herein enacted is hereby declared as a matter of legislative determination."

In general, the Urban Renewal Act empowers cities to determine the existence of blighted areas within their environs; to acquire lands and structures in a blighted area by purchase (RCW 35.81.070) or condemnation (RCW 35-.81.080); and, after acquisition, to hold, improve, clear, or prepare the property for redevelopment.

In addition, RCW 35.81.090 provides:

"A municipality may sell, lease, or otherwise transfer real property or any interest therein acquired by it for an urban renewal project, in an urban renewal area for residential, recreational, commercial, industrial, or other uses or for public use, and may enter into contracts with respect thereto, or may retain such property or interest only for parks and recreation, education, public utilities, public transportation, public safety, health, highways, streets, and alleys, administrative buildings, or civic centers, in accordance with the urban renewal project plan, subject to such

covenants, conditions, and restrictions, including covenants running with the land, as it may deem to be necessary or desirable to assist in preventing the development or spread of blighted areas or otherwise to carry out the purposes of this chapter:   . . ."

A "blighted area" is defined in RCW 35.81.010(2) as follows:

" 'Blighted area' shall mean an area which, by reason of the substantial physical dilapidation, deterioration, defective construction, material, and arrangement and/or age or obsolescence of buildings or improvements, whether residential or nonresidential, inadequate provision for ventilation, light, proper sanitary facilities, or open spaces as determined by competent appraisers on the basis of an examination of the building standards of the municipality; inappropriate or mixed uses of land or buildings; high density of population and overcrowding; defective or inadequate street layout; faulty lot layout in relation to size, adequacy, accessibility or usefulness; excessive land coverage, insanitary or unsafe conditions; deterioration of site; diversity of ownership; tax or special assessment delinquency exceeding the fair value of the land; defective or unusual conditions of title; improper subdivision or obsolete platting; or the existence of conditions which endanger life or property by fire or other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime; substantially impairs or arrests the sound growth of the city or its environs, retards the provision of housing accommodations or constitutes an economic or social liability, and/or is detrimental, or constitutes a menace, to the public health, safety, welfare, and morals in its present condition and use."

Since the parties have stipulated that the city of Tacoma has complied with all federal and state procedural requirements (Title 1 of the Housing Act of 1949, as amended; Laws of 1957, chapter 42), it is unnecessary to detail other provisions of the act. It is sufficient to note that (a) the city of Tacoma approved and adopted a comprehensive urban renewal plan; (b) thereafter, a project plan was prepared for the acquisition and development of a section of the city under the name of "Center Street Urban Renewal Area, Project No. Wash. R-1"; (c) the planning commission ap-

proved the project plan as conforming to the city's comprehensive plan; (d) after public notice, public hearing, and a view of the area, the city council of Tacoma passed Resolution No. 16094, which approved and adopted the Center Street Urban Renewal Project.

The resolution found that the area is "blighted," as defined by the legislature in RCW 35.81.010(2), quoted *supra*; (We note that the exact statutory language was used in the ordinance.) the area is in need of redevelopment; and a sound and adequate financial program exists for financing the project.

Plaintiff groups his 29 assignments of error into five contentions. They raise, substantially, the same constitutional questions presented to other appellate courts that have considered the constitutionality of urban renewal laws. See *Foeller v. Housing Authority of Portland*, 198 Ore. 205, 214, 256 P. (2d) 752, 757 (1953).

## I.

Plaintiff contends that Laws of 1957, chapter 42, is unconstitutional because the title (see appendix, note 2) violates Art. 2, § 19, of the state constitution that provides:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

The specific attack is that the title does not indicate (1) that a court order may be obtained to enter upon property to make surveys and appraisals (RCW 35.81.070(3)) nor (2) that the city has authority " . . . to disseminate blight clearance and urban renewal information." RCW 35-.81.070(1).

We do not agree.

"The purposes of this constitutional mandate are three-fold: (1) to protect and enlighten the members of the legislature against provisions in bills of which the titles give no intimation; (2) to apprise the people, through such publication of legislative proceedings as is usually made, concerning the subjects of legislation that are being considered; and (3) to prevent hodge-podge or log-rolling legisla-

tion. . . . " *State ex rel. Toll Bridge Authority v. Yelle,* 32 Wn. (2d) 13, 200 P. (2d) 467 (1948).

The title to chapter 42, Laws of 1957, falls squarely within the rule stated in *Gruen v. State Tax Comm.,* 35 Wn. (2d) 1, 22, 211 P. (2d) 651 (1949):

" . . . Where the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will, or may, facilitate the accomplishment of the purpose so stated, are properly included in the act and are germane to its title."

■ To carry out the purposes of the act, some form of inspection must be made as a basis of factual determination. See appendix, note 3. The means of determining blight must necessarily be involved in order to undertake an urban renewal program. The dissemination of urban renewal information is within the scope of the title.

The title of an act need not be an index to the contents of the legislation (*Hogue v. Port of Seattle,* 54 Wn. (2d) 799, 810, 341 P. (2d) 171 (1959)); nor need it express, in detail, every phase of the subject of the enactment. If the title gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind, the scope and purpose of the law, it is sufficient. *State ex rel. Toll Bridge Authority v. Yelle, supra,* and cases cited.

The title to the questioned act meets the requirements of Art. 2, § 19, of our constitution.

## II.

This is the basic constitutional question: Are the acquisition, elimination, and redevelopment of blighted areas, and the subsequent resale of a portion of these areas to private persons, with use restrictions under the urban renewal law, a public use that warrants the exercise of the power of eminent domain and a public purpose that justifies the expenditure or loan of public funds.

■ The power of eminent domain is an attribute of sovereignty. It is an inherent power of the state; not derived

from, but limited by, the fundamental principles of the constitution.

The pertinent provisions of the Washington Constitution are:

Amendment 9 to Art. 1, § 16:

"Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public . . ."

The use of taxes for other than public purpose is prohibited by Amendment 14 to Art. 7, § 1, providing, in part:

". . . All taxes shall be . . . levied and collected for public purposes only. . . ."

and Article 8, § 7, providing, in part:

"No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation . . ."

The constitutions of most states have provisions governing eminent domain, public use, and protection of private property that are similar to this state's. To set them forth would extend this opinion. Reference to various state constitutional provisions is made in note 4 of the appendix.

Six states have constitutional provisions specifically authorizing urban redevelopment and renewal programs: *California*, Art. 13, § 19; *Georgia*, Art. 16; *Maryland*, Art. 11-B; *Missouri*, Art. 6, § 21; *New Jersey*, Art. 8, § 3, ¶ 1; *New York*, Art. 18, §§ 1, 2. Cases decided under these constitutional provisions are set forth in note 5 of the attached appendix.

The constitutional provision that " . . . the question whether the contemplated use be really public shall be a

judicial question . . . ." does not preclude the legislative prerogative of declaring a public use in the first instance (*State ex rel. Andersen v. Superior Court*, 119 Wash. 406, 409, 205 Pac. 1051 (1922), and the legislative declaration that blighted areas constitute a serious and growing menace injurious to the public health, safety, morals, and welfare ". . . . is entitled to great weight; . . . ." *Hogue v. Port of Seattle*, 54 Wn. (2d) 799, 817, 341 P. (2d) 171 (1959); however, whether "the contemplated use be really public" is solely a judicial question and ultimately must be decided by this court. *Hogue v. Port of Seattle, supra; State ex rel. Andersen v. Superior Court, supra; Public Util. Dist. No. 1 v. Washington Water Power Co.*, 43 Wn. (2d) 639, 262 P. (2d) 976 (1953); *State ex rel. Dungan v. Superior Court*, 46 Wn. (2d) 219, 279 P. (2d) 918 (1955).

■ The words "public use" are neither abstractly nor historically capable of complete definition. The words must be applied to the facts of each case in the light of current conditions. In Washington, "public use" was defined in *Carstens v. Public Util. Dist. No. 1*, 8 Wn. (2d) 136, 142, 111 P. (2d) 583 (1941), cert. den. 314 U. S. 667, 86 L. Ed. 533, 62 S. Ct. 128 (1941). The court said:

"The term 'public use' is one which has been examined innumerable times by the courts, but no concise, clear definition thereof has emerged from the mass of judicial language devoted to the subject. Perhaps the best approach to the question is to be found in the following passage from *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 200 Atl. 834:

" 'On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the conclusion that judicial interpretation of "public use" has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover,

views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that to-day there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of "public use" naturally expands in proportion.' "

In *Berman v. Parker*, 348 U. S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954), the urban renewal act of the District of Columbia (60 Stat. 790), a law broader than our own, was upheld against an attack based upon the "public use" requirement of the fifth amendment to the United States Constitution. Thus, any question of public use or due process under the federal constitution, with regard to this type of legislation, is settled.

Urban renewal legislation has been held unconstitutional in three states. *Adams v. Housing Authority of Daytona Beach,* 60 So. (2d) 663 (Fla. 1952); *Housing Authority of Atlanta v. Johnson,* 209 Ga. 560, 74 S. E. (2d) 891 (1953); *Edens v. Columbia,* 228 S. C. 563, 91 S. E. (2d) 280 (1956). In Georgia, a constitutional amendment that authorizes urban renewal legislation was adopted after the court's decision in the *Johnson* case, *supra.*

As we have pointed out heretofore, the grounds upon which plaintiff attacks the constitutionality of the urban renewal law parallel the attack made on similar legislation in other jurisdictions. They present, for the most part, the same questions of constitutional interpretation as our own constitutional provisions, quoted *supra.*

Reduced to the lowest common denominator, plaintiff urges that the law is unconstitutional because (a) many of the elements set forth in the statutory definition of a "blighted area" are not sufficient to support a conclusion that the area is being acquired for a public use; and (b) the power to sell the property later to private persons makes the use a private one.

(a) *Blighted area:* The trial court concluded (as a portion of conclusion of law No. 5, to which no error is assigned):

"That the following conditions of a 'blighted area,' as contained in Section 1, Chapter 42, Laws of 1957 [RCW 35-.81.010(2)], to wit:

" ' . . . inappropriate or mixed uses of land or buildings, defective or inadequate street layout, faulty lot layout in relation to size, accessibility or usefulness, excessive land coverage, diversity of ownership, defective or unusual conditions of title, improper subdivision or obsolete platting . . .' have no effect on the public health, safety, morals or welfare; . . ."

■■■ There are other portions of RCW 35.81.010(2) that define "blighted areas"—such as

" . . . substantially impairs or arrests the sound growth of the city or its environs, retards the provision of housing accommodations or constitutes an economic or social liability . . ."—

that may also be suspect as insufficient to support a constitutional "public use." We find it neither necessary nor proper to pass upon these considerations, for we believe that RCW 35.81.010(2) is sufficient to support the conclusion of "public use"—especially if the area contains " . . . insanitary or unsafe conditions"; " . . . conditions which endanger life or property by fire or other causes . . ."; conditions " . . . conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime . . ."; or if the area " . . . is detrimental or constitutes a menace to the public health, safety, welfare, and morals in its present condition and use."

In each case there must be found a rational connection between the evil sought to be cured and the means adopted by the legislature to cure it.

In *Crommett v. Portland*, 150 Me. 217, 235, 107 A. (2d) 841 (1954), quoted in *Hogue v. Port of Seattle, supra,* the court upheld the validity of a slum clearance redevelopment authority. It said:

" 'The determination of whether an area is "blighted" or "slum" under the statute must rest upon *facts directly bearing upon the public health, safety, morals or welfare.* Consideration of other facts not so grounded, however, does not affect the validity of the finding, if the pertinent facts are

in themselves sufficient to show the "blighted" or "slum" condition.' " (Italics ours.)

It is of interest to note that the same court later advised that a proposed statute, permitting a city to acquire land by purchase or condemnation to create an industrial park and later to sell or lease it to private entities, was unconstitutional because it was not for a public use. *Opinion of the Justices,* 152 Me. 440, 131 A. (2d) 904 (1957). Accord: *Opinion of the Justices,* 332 Mass. 769, 126 N. E. (2d) 795 (1955); *Opinion of the Justices,* 334 Mass. 760, 135 N. E. (2d) 665 (1956).

(b) *Resale of land.* A survey of the decided cases discloses at least four theories, each supporting the same conclusion, that urban renewal legislation is not rendered unconstitutional by reason of the fact that some of the land may be resold, subject to use restrictions that prevent reoccurrence of the blighted condition, to private interests for redevelopment.

■ First: In *Berman v. Parker,* 348 U. S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954), this court said:

". . . Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. *Here one of the means chosen is the use of private enterprise for redevelopment of the area.* Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, *once the public purpose has been established.* [Citing cases.] The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. . . ." (Italics ours.)

Second: In *Velishka v. Nashua,* 99 N. H. 161, 106 A. (2d) 571, 44 A. L. R. (2d) 1406 (1954), the court said:

". . . The resale or lease with conditions consistent with the redevelopment plan are *an essential and continuing part of the public purpose.* This has been recognized in many jurisdictions. [Citing authorities]" (Italics ours.)

Accord: *Hunter v. Norfolk Redevelopment & Housing Authority*, 195 Va. 326, 78 S. E. (2d) 893 (1953).

Third: In *Foeller v. Housing Authority of Portland*, 198 Ore. 205, 256 P. (2d) 752 (1953), the court emphasized that the primary accomplishment of such legislation is the prevention of the recurrence of blight by placing restrictions in deeds of reconveyance.

Fourth: In many cases (see appendix, note 6) the subsequent transfer of land to private parties is described as being "merely incidental to the main public purpose."

An overwhelming majority of the courts of last resort in other jurisdictions have held that urban renewal laws, similar to the one before us, are for a "public use" and constitutional; hence, the expenditure of public funds is for a public purpose.

We agree.

Many of the cases are collected in an annotation: "Validity, construction, and effect of statutes providing for urban redevelopment by private enterprise," by C. C. Marvel, 44 A.L.R. (2d) 1414 (1955). The attached appendix, note 6, sets forth the leading cases on this subject in each jurisdiction.

### III.

Plaintiff contends that the urban renewal law unlawfully delegates legislative authority to the governing body of the municipality, in violation of amendment 7 of the state constitution.

In order to avoid the charge of unlawfully delegated legislative power, the statute must lay down basic standards and a reasonably definite policy for the administration of the law.

The rule is succinctly stated in *Keeting v. Public Util. Dist. No. 1*, 49 Wn. (2d) 761, 767, 306 P. (2d) 762 (1957).

"It is unconstitutional for the legislature to abdicate or transfer to others its legislative function. It is not unconstitutional for the legislature to delegate administrative power. In so doing, the legislature must define (a) what is to be done, (b) the instrumentality which is to accomplish

it, and (c) the scope of the instrumentality's authority in so doing, by prescribing reasonable administrative standards."

Plaintiff concedes (a) and (b), but contends a violation of requirement (c). The attack is directed, mainly, to the adequacy and reasonableness of the standards set forth in RCW 35.81.010 (2), quoted *supra*, which define "blighted area." We note, however, that the standards that define the limits of the exercise of power are not to be found in any one provision, but appear throughout the act.

In matters relating to public resources, public health, safety, morals and welfare, the standards and policy may, of necessity, require more general grants of authority.

In *Yelle v. Bishop*, 55 Wn. (2d) 286, 302, 347 P. (2d) 1081 (1959), it was held that

"The complexity and character of the subject matter of legislation are to be considered in determining whether there has been an unlawful delegation of legislative power. *Senior Citizens League, Inc. v. Department of Social Security*, 38 Wn. (2d) 142, 228 P. (2d) 478 (1951); *Kelleher v. Minshull*, 11 Wn. (2d) 380, 119 P. (2d) 302 (1941); 11 Am. Jur. 948, Constitutional Law, § 234. . . ."

Although, in this opinion, we have cast some doubt on the sufficiency of a few of the particular standards set forth in the statute, should they stand alone, we agree with the Supreme Court of Pennsylvania (*Belovsky v. Redevelopment Authority of Philadelphia*, 357 Pa. 329, 54 A. (2d) 277 (1947), as quoted with approval in *Foeller v. Housing Authority of Portland, supra*), when it said:

" 'The fact is, however, that the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express; in regard to such factors as the selection and the size of the areas to be redeveloped, the costs involved, and the exact form which the redevelopment in any particular case is to take, it was obviously impossible for the legislature to make detailed provisions or blueprints in advance for each operation.' "

The nature and extent of a blighted area will necessarily vary—not only between cities, but also within the same city. All that the legislature can reasonably do, in

the circumstances, is prescribe a fixed standard and rules of general application adapted to accomplish the purpose of the act. It leaves to the local authority the responsibility of ascertaining, as a matter of fact, whether a blighted area exists in the community, within the meaning of the act. The determination of that factual question is an administrative act and not the exercise of legislative power. The authorities are collected in the annotation, 44 A.L.R. (2d) at 1427, *et seq*.

We conclude, as has every other jurisdiction considering the question, that the Urban Renewal Law is not unconstitutional as an unlawful delegation of legislative authority.

### IV.

Plaintiff contends that the action of the city council was arbitrary and capricious when it adopted resolution No. 16094 and determined the area to be blighted.

Arbitrary and capricious action has been defined as wilful and unreasoning action, without consideration and regard for facts or circumstances. *Lillions v. Gibbs*, 47 Wn. (2d) 629, 633, 289 P. (2d) 203 (1955). A finding of fact made without evidence in the record to support it, and an order based upon such finding, is arbitrary. *State ex rel. Tidewater-Shaver Barge Lines v. Kuykendall*, 42 Wn. (2d) 885, 891, 259 P. (2d) 838 (1953). When there is evidence in the record, however, and

". . . Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached. [Citing authorities.]." *Smith v. Hollenbeck*, 48 Wn. (2d) 461, 464, 294 P. (2d) 921 (1956).

In the record before us is a 26-page stipulation of counsel that contains

". . . the written evidence presented to the Council of the City of Tacoma at the public hearing on April 4, 1960 and the transcript of the public hearing on said date."

Made a part of the stipulation, by reference, are 15 exhibits, for the most part written reports; to many of them

are attached a great number of illustrative charts, maps, and photographs dealing with the area in question.

The exhibits contain exhaustive reports from the Tacoma City Planning Commission; American Public Health Association; Director of Health, on rodent infestation; Building Inspector, on commercial and industrial structures; Chief Fire Inspector; Department of Public Works; and the Tacoma Housing Authority.

Exhibit No. 2 is a 51-page, single-spaced, stenographic transcript of the public hearing held by the Tacoma City Council on April 4, 1960. In addition to the oral presentation of the written reports, to which we have referred, it contains the verbatim statement, to the council, of those speaking against the project.

The council continued its consideration of resolution 16094 until April 11, 1960, when the resolution was adopted.

It would serve no useful purpose to detail the facts of the various reports and the public hearing. It is sufficient to state that, as the trial judge remarked in his memorandum decision,

"The City of Tacoma, by its resolution No. 16094, made a finding that there were a combination of factors constituting a menace to the public health, safety, welfare and morals in its [the area's] present condition and use. Among these factors found by the City was extreme fire danger, heavy rodent infestation, danger of disease transmission, ill health and infant mortality, improper ventilation, light and sanitary facilities, physical delapidation, deterioration and defective construction . . ."

There is nothing to indicate that the judgment of the city council was not "exercised honestly and upon due consideration" of the extensive record before it.

It may be that resolution No. 16094 is ill-advised and may prove to be a disappointment to the city of Tacoma, (see appendix, note 7) but the wisdom of its enactment is the responsibility of the city council; it does not present a judicial question.

In view of the record considered by the city council, we conclude that its action was not arbitrary and capricious, as defined by the decisions of this court.

## V.

Finally, plaintiff, whose residential property is not substandard, but is located within the "blighted area," contends that it is an unconstitutional discrimination to include his property and to exclude other property of the same class within the boundaries of the area. This is essentially an attack on the "area concept."

Specifically, plaintiff assigns error to conclusion of law No. 13:

"That all lands included in a blighted area need not be taken under Chapter 42, Laws of 1957, as amended by Chapter 79, Laws of 1959; that omission to take particular lots does not invalidate the taking of the remainder of the area; and that 'blighted' is determined by area and not undeveloped property, and it is not necessary that every undeveloped property be 'blighted' as long as the area as a whole comes within the definition of a 'blighted area' as defined in Section 1, Chapter 42, Laws of 1957."

It has been repeatedly held that the fact that some lands in a blighted area are vacant lands or contain inoffensive or innocuous structures does not invalidate the statute permitting the taking of the property, usually on the ground that the taking is justified as a necessary concomitant of a blighted area.

In *Velishka v. Nashua*, 99 N. H. 161, 106 A. (2d) 571, 44 A.L.R. (2d) 1406 (1954), the court answered plaintiff's contention as follows:

"It is to be noted that the plaintiff Velishka's property is not blighted property and it is urged that the act thereby allows the power of eminent domain to be employed for uses inconsistent with the purposes of the act. The intent of the act was to acquire and prevent recurrence of 'blighted areas.' Experience has shown and the facts of this case indicate that the area must be treated as a unit and that a particular building either within or near the blighted area may have to be included to accomplish the purposes of the act. It is not necessary that every building in such an area be in a blighted condition before the whole area may be condemned. It is sufficient that the taking as a whole is reasonably necessary to the clearance of blighted areas and prevention of their recurrence. . . ."

Accord: *Berman v. Parker*, 348 U. S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954). Further authorities are collected in the annotation in 44 A. L. R. (2d) at 1439.

The judgment is affirmed.

FINLEY, HUNTER, HAMILTON, and HALE, JJ., concur.

## APPENDIX

Note 1—See Title 1 of the Housing Act of 1949, as amended; and the Housing Act of 1954. 42 U. S. C. 1441, *et seq.*

Note 2—Title to Laws of 1957, chapter 42:

"AN ACT to provide for the rehabilitation, redevelopment, and clearance of blighted areas in cities and towns in this state in accordance with urban renewal plans approved by the governing bodies thereof; to define the duties, liabilities, exemptions and powers of such cities and towns in undertaking such activities, including the power to acquire property through the exercise of the power of eminent domain or otherwise, to dispose of property subject to any restrictions deemed necessary to prevent the development or spread of future deteriorated or blighted areas, to issue revenue bonds and other obligations, to levy taxes and assessments and to enter into agreements to secure federal aid and comply with conditions imposed in connection therewith; to provide for an urban renewal agency and its powers hereunder if a city or town determines it to be in the public interest; to authorize public bodies to furnish funds, services, facilities and property in aid of urban renewal projects hereunder; and to provide that properties while held by a public agency hereunder shall be exempt from taxation."

Note 3—This is mandatory under the Housing Act of 1949, as amended, 42 U.S.C. 1451(c). The title to chapter 42, Laws of 1957, specifically covers the authority to comply with conditions imposed in connection with federal aid.

Note 4—Constitutional provisions *re* eminent domain, public use, and protection of private property: Alabama, Art. 1, § 23; Arkansas, Art. 2, § 22; Colorado, Art. 2, §§ 14, 15 (very similar to Washington); Connecticut, Art. 1, § 11; Delaware, Art. 1, § 8; Florida, Art. 16, § 29; Illinois, Art. 2, § 13; Indiana, Art. 1, § 21; Kansas, Art. 12, § 4; Maine, Art. 1, § 21; Massachusetts, Art. 10 (Pt. 1); Michigan, Art. 13, §§ 1, 2; Minnesota, Art. 1, § 13; New Hampshire, Part 1, Art. 12; North Carolina, Art. 1, § 17; Ohio, Art. 1, § 19; Oregon, Art. 1, § 18; Pennsylvania, Art. 1, § 10 and Art. 16, § 3; Rhode Island, Art. 1, § 16; South Carolina, Art. 1, § 17; Tennessee, Art. 1, § 21; Texas, Art. 1, § 17; Virginia, § 58; Wisconsin, Art. 1, § 13.

Note 5—Urban Redevelopment Laws Held Constitutional under Specific Constitutional Provisions:

*California: Redevelopment Agency of City & Cy. of San Francisco v. Hayes*, 122 Cal. App. (2d) 777, 266 P. (2d) 105 (1954), cert. den. in *Van Hoff v. Redevelopment Agency of City & Cy. of San Francisco*, 348 U. S. 897, 99 L. Ed. 705, 75 S. Ct. 214 (1954); *Babcock v. Commu-*

*nity Redevelopment Agency of Los Angeles,* 148 Cal. App. (2d) 38, 306 P. (2d) 513 (1957).

*Georgia: Bailey v. Housing Authority of Bainbridge,* 214 Ga. 790 107 S.E. (2d) 812 (1959);
*Allen v. City Council of Augusta,* 215 Ga. 778, 113 S. E. (2d) 621 (1960).

*Maryland: Herzinger v. Mayor & City Council of Baltimore,* 203 Md. 49, 98 A. (2d) 87 (1953).

*Missouri: State on Information of Dalton v. Land Clearance for Redevelopment Authority of Kansas City,* 364 Mo. 974, 270 S. W. (2d) 44 (1954).

*New Jersey: Wilson v. Long Branch,* 27 N. J. 360, 142 A. (2d) 837 (1958), cert. den. 358 U. S. 873, 3 L. Ed. (2d) 104, 79 S. Ct. 113 (1958).

*New York: Murray v. LaGuardia,* 291 N. Y. 320, 52 N. E. (2d) 884 (1943), cert. den. 321 U. S. 771, 88 L. Ed. 1066, 64 S. Ct. 530.

Note 6—Redevelopment Laws Held Constitutional:

*Alabama: Opinion of the Justices,* 254 Ala. 343, 48 So. (2d) 757 (1950); *Blankenship v. Decatur,* 269 Ala. 670, 115 So. (2d) 459 (1959).

*Arkansas: Rowe v. Housing Authority of Little Rock,* 220 Ark. 698, 249 S. W. (2d) 551 (1952).

*Colorado: Rabinoff v. District Court,* 145 Colo. 225, 360 P. (2d) 114 (1961).

*Connecticut: Gohld Realty Co. v. Hartford,* 141 Conn. 135, 104 A. (2d) 365 (1954).

*Delaware: Randolph v. Wilmington Housing Authority,* 37 Del. Ch. 202, 139 A. (2d) 476 (1958).

*District of Columbia: Schneider v. District of Columbia,* 117 F. Supp. 705 (1953), affirmed as modified by *Berman v. Parker,* 348 U. S. 26, 99 L. Ed. 27, 75 S. Ct. 98.

*Florida: Grubstein v. Urban Renewal Agency of Tampa,* 115 So. (2d) 745 (Fla. 1959).

*Illinois: Zurn v. Chicago,* 389 Ill. 114, 59 N. E. (2d) 18 (1945); *People ex rel. Adamowski v. Chicago Land Clearance Comm.,* 14 Ill. (2d) 74, 150 N. E. (2d) 792 (1958).

*Indiana: Alanel Corp. v. Indianapolis Redevelopment Comm.,* 239 Ind. 35, 154 N. E. (2d) 515 (1958).

*Kansas: State ex rel. Fatzer v. Urban Renewal Agency of Kansas City,* 179 Kan. 435, 296 P. (2d) 656 (1956).

*Kentucky: Miller v. Louisville,* 321 S. W. (2d) 237, (Ky. 1959).

*Maine: Crommett v. Portland,* 150 Me. 217, 107 A. (2d) 841 (1954).

*Massachusetts: Papadinis v. Somerville,* 331 Mass. 627, 121 N. E. (2d) 714 (1954);
*Worcester Knitting Realty Co. v. Worcester Housing Authority,* 335 Mass. 19, 138 N. E. (2d) 356 (1956).

*Michigan: In re Slum Clearance in Detroit,* 331 Mich. 714, 50 N. W. (2d) 340 (1951).

*Minnesota: Housing & Redevelopment Authority of St. Paul v. Greenman,* 255 Minn. 396, 96 N. W. (2d) 673 (1959).

*New Hampshire: Velishka v. Nashua,* 99 N. H. 161, 106 A. (2d) 571, 44 A. L. R. (2d) 1406 (1954).

*New Jersey: Redfern v. Board of Comm. of Jersey City,* 137 N. J. L. 356, 59 A. (2d) 641 (1948).

*North Carolina: Redevelopment Comm. of Greensboro v. Security Nat. Bank of Greensboro,* 252 N. C. 595, 114 S. E. (2d) 688 (1960).

*Ohio: State ex rel. Bruestle v. Rich,* 159 Ohio St. 13, 110 N. E. (2d) 778 (1953).

*Oregon: Foeller v. Housing Authority of Portland,* 198 Ore. 205, 256 P. (2d) 752 (1953).

*Pennsylvania: Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 A. (2d) 277 (1947).

*Rhode Island: Opinion to the Governor,* 76 R. I. 249, 69 A. (2d) 531 (1949);
*Ajootian v. Providence Redevelopment Agency,* 80 R. I. 73, 91 A. (2d) 21 (1952).

*Tennessee: Nashville Housing Authority v. Nashville,* 192 Tenn. 103, 237 S. W. (2d) 946 (1951).

*Texas: Davis v. City of Lubbock,* 160 Tex. 38, 326 S. W. (2d) 699 (1959).

*Virginia: Hunter v. Norfolk Redevelopment & Housing Authority,* 195 Va. 326, 78 S. E. (2d) 893 (1953).

*Wisconsin: David Jeffrey Co. v. Milwaukee,* 267 Wis. 559, 66 N. W. (2d) 362 (1954).

Note 7: Jane Jacobs: *The Death and Life of Great American Cities,* Random House (1961).

ROSELLINI, J. (dissenting)—The plaintiff challenges the constitutionality of Laws of 1957, chapter 42, p. 134 (RCW chapter 35.81), known as the Urban Renewal Law, and appeals from the judgment of the trial court dismissing the action with prejudice.

The appellant is a resident and taxpayer of the city of Tacoma. He owns and occupies a home in an urban renewal project area. His home is sound, modern, and valuable. It is in first-class condition, and is not blighted or deteriorated.

The city, in determining whether the appellant's house met the standard of the American Public Health Association, assessed one penalty point against the dwelling. This point was based on the fact that the city found a defective refuse container which was subject to invasion by rodents or insects. The evidence in the record is that a house cannot be considered substandard unless it receives from 60 to 79 penalty points, and it cannot be considered in the category of slum housing unless it receives at least 80 penalty points.

The city plans to acquire most of the real property within

an area of approximately 68 acres. After demolition of the buildings, it will resell or lease the land to individuals for private use. Upon the redevelopment and renewal, most of the Center Street project area will be restricted to light manufacturing. The remainder is to be used for private housing.

The city will condemn the appellant's property in the absence of a voluntary sale. However, several residences within the project area are not being taken by the city. The explanation given for this discrimination is that the appellant's property is needed for a site for future industrial and commercial use, and that the other houses are not.

The appellant's assignments of error raise the question whether the urban renewal act violates amendment 9, Art. 1, § 16, of the state constitution in that the city will take his property and resell the condemned land to private developers—in short, that it will take his land for private use.

In no case has this court ever held that the power of eminent domain may be used to take private property for immediate private use, even where there may be an ultimate public benefit. Our cases have held to the contrary.

In *Reed v. Seattle,* 124 Wash. 185, 213 Pac. 923, 29 A. L. R. 446, it was contended that a proposed gasoline filling station in a certain street would be of such benefit to the traveling public that condemnation of private property for this purpose was warranted. This court said:

"Nor does the fact that an oiling station is a convenience to the public traveling in automobiles authorize the leasing of a part of the public highway for such a purpose. As we pointed out in the case of *Healy Lum. Co. v. Morris,* 33 Wash. 490, 74 Pac. 681, 99 Am. St. 964, 63 L. R. A. 820, public use is not synonymous with public benefit, and private property cannot be taken for private use through the exercise of the right of eminent domain, however much the public would be benefited thereby."

In the early case of. *Smith v. Smythe,* 197 N. Y. 457, 90 N. E. 1121, the court said, quoting from *In re Niagara Falls & W. R. Co.,* 108 N. Y. 375, 15 N. E. 429:

". . . 'The expressions *public interest* and *public use* are not synonymous. The establishment of furnaces, mills and manufacturers, the building of churches and hotels, and other similar enterprises, are more or less matters of public concern, and promote, in a general sense, the public welfare. But they lie without the domain of public uses for which private ownership may be displaced by compulsory proceedings.' . . ."

This same view was adopted by the Supreme Court of this state in *Neitzel v. Spokane International R. Co.,* 65 Wash. 100, 117 Pac. 864; *Matthews v. Belfast Mfg. Co.,* 35 Wash. 662, 77 Pac. 1046, and *Healy Lbr. Co. v. Morris,* 33 Wash. 490, 74 Pac. 681, in each of which it was held that a "public use" must be either a use by the public or by some agency which is quasi public, and not simply a use which may incidentally or indirectly promote the public interest or general prosperity of the state.

The case of *Neitzel v. Spokane International R. Co., supra,* involved a contention by a railway company which had condemned land for railway purposes and then rented it to a wholesale grocery company, that the use made of the land by the grocery company was a public use. We said that, while it might be of public benefit or in the public interest, no obligation rested upon the grocery company to conduct its business for the benefit of the public, and that the true criterion of a public use is whether the public may enjoy the use made of the property by right or by permission only. We emphasized the point that the terms "public use" and "public interest" are not synonymous.

The latest expression of this court is found in *King Cy. v. Theilman,* 59 Wn. (2d) 586, 369 P. (2d) 503, an action by the county to condemn private property for road purposes. This court said:

"We find the facts of the instant case bizarre, if not unique. From the record, it is apparent that the Highland Development Company could not have condemned relator's property as a private way of necessity; the company had highway frontage and two feasible ways of approach. Though we do not think the county's participation in taking relator's property by eminent domain is a cloak

to cover private objectives, the effect of this action is to allow a private party to do indirectly that which the law prevents him from doing directly. The ultimate effect is to allow a neighboring land developer to take private property for a private use. This action is the county's in name only. It had no funds budgeted either to acquire relator's land or to build the road across it."

In *Riley v. Charleston Union Station Co.,* 71 S. C. 457, 51 S. E. 485, in discussing the principles which apply in determining whether a use is public or private, the court said:

" . . . It is not easy to give a definition of public use which will be adequate to cover every case that may properly fall within the terms, and this case does not call for an attempt to define the terms. Some cases take the very broad view that 'public use' is synonymous with 'public benefit.' A more restricted view, however, would seem to better comport with the due protection of private property against spoliation under the guise of eminent domain. Judge Cooley, in his Constitutional Limitations, 654, says: 'The public use implies possession, occupation and enjoyment of the land by the public at large or by public agencies; and the due protection of the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another on vague grounds of public benefit, to spring from a more profitable use to which the latter will devote it.' In Lewis on Eminent Domain, sec. 165, it is said that 'public use' means the same as 'use by the public.' These definitions involve the idea that the public must have a definite and fixed use of the property to be condemned, independent of the will of the person or corporation taking title under condemnation, and that such use by the public is protected by law. *Fallisburg Power & Mfg. Co. v. Alexander,* 101 Va. 98; 99 Am. St. Rep. 855. The case of *Healy Lumber Co. v. Morris,* 33 Wash. 490; 99 Am. St. Rep. 964, holds that 'a public use must be either a use by the public or by some *quasi* public agency and not simply a use which may incidentally or indirectly promote the public interest or general prosperity.' . . . "

The majority rely on the authority of the slum clearance and urban redevelopment statutes that have been sustained as constitutional in 30 states, and by the United States Supreme Court for the District of Columbia. This argu-

ment is not persuasive, as is shown by the following illustrations:

In *Berman v. Parker*, 348 U. S. 26, 99 L. Ed. 27, 75 S. Ct. 98, it was decided upon a unique and novel theory that the exercise of the power of eminent domain is only incidental to the police power. "Public use" is confused with "public welfare." The part that this theory played in the decision is best illustrated by a quotation from the opinion of Mr. Justice Douglas, speaking for the court:

" . . . The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

Many other cases are decided upon the theory that the power of eminent domain may be exercised for a public purpose, a public benefit, or the public welfare, disregarding the requirement of our constitution that it be for a public use. Typical of these is *Gohld Realty Co. v. Hartford*, 141 Conn. 135, 104 A. (2d) 365. From this case we quote:

" 'In this State it is settled that public use means "public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the State under its right of eminent domain for purposes of great advantage to the community, is a taking for public use." . . .' "

Seven states have forthrightly by constitutional amendment expanded the power of eminent domain to include the right to condemn property for the purposes of urban renewal projects. An illustration of this is found in *Allen*

*v. City Council of Augusta,* 215 Ga. 778, 113 S. E. (2d) 621, wherein it is said:

"By an amendment to the Constitution (Ga. L. 1953, Nov.-Dec. Sess., p. 538), which was ratified by a vote of the people, the historic constitutional protection of private property, except for public purposes, was voluntarily surrendered by the people themselves. *Thus this court is without power to protect such property as was done in Housing Authority of City of Atlanta v. Johnson,* 209 Ga. 560 (74 S. E. 2d 891). This condition was referred to in *Bailey v. Housing Authority of City of Bainbridge,* 214 Ga. 790 (107 S. E. 2d 812). The Constitution as thus amended allows the General Assembly to provide by law that any city or town or housing authority 'may undertake and carry out slum clearance and redevelopment work. . . .'" (Italics mine.)

Finally, we have consistently and uniformly construed the language of amendment 9, Art. 1, § 16, "Private property shall not be taken for private use," as prohibiting the taking of a person's property unless the public has a fixed and definite use of the property, and not simply a use which may incidentally or indirectly promote the public interest or general prosperity. See the cases cited *supra.*

To depart from our former interpretation would be contrary to the rule of *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805, wherein we approved and adopted the following statement:

" 'A cardinal rule in dealing with constitutions is that they should receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, even though the circumstances may have so changed as to make a different rule seem desirable. In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, constitutions do not change with the varying tides of public opinion and desire. The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change

in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders.' 6 R. C. L. 46."

This court is bound by our own constitution and by our former opinions construing it. Our constitution flatly says that private property may not be taken for private use.

The files and records herein disclose that the urban renewal area will consist of the 68 acres to be acquired either by condemnation or purchase. The plan is to raze all of the buildings on approximately 80 per cent of the acquired area and to sell or lease the land so acquired to private individuals for light manufacturing or business enterprises. This fact is made manifest by the plan, which provides that in 80 per cent of the area to be sold, the land uses are to be limited to 23 categories containing some 100 different types of light manufacturing and business enterprises, of which the following are typical: soft drinks and beer-bottling works, canning and manufacturing of food products, wholesale businesses, private clubs, restaurants, cocktail lounges, taverns, drive-in establishments, undertaking establishments, banks, clinics, medical and dental buildings, blacksmith shops, and mirror works. The city is not authorized to engage in any of these activities.

The act also discloses that one of the dominant aims of the legislature was to provide for the transferring of the greatest portion of the renewal area to private enterprise.

Section 3, Laws of 1957, chapter 42, p. 140, provides:

"A municipality, to the greatest extent it determines to be feasible in carrying out the provisions of this act, shall afford maximum opportunity, consistent with the sound needs of the municipality as a whole, to the rehabilitation or redevelopment of the urban renewal area by private enterprise. . . ."

The act further provides in § 1 (15) (d), p. 137, that the disposition of any property acquired in the urban renewal area shall be by sale or initial lease at its fair market value.

Section 6 (5), p. 143, provides:

"An urban renewal project plan may be modified at any time by the local governing body: . . ."

Thus, the appellant's property may be condemned and; if the city chooses to so modify its present plan, it may immediately resell or lease it to a private individual.

One man's land should not be seized by the government and sold to another man so that the purchaser may build a better house, or enhance the beauty or aesthetic value according to the ideas of an artist or planner whose tastes have the sanction of the government. In essence, the basic idea of this project is that government knows best what use a person's property should be put to, and it will insist that it be put to that use by condemning it and selling it to another private individual who will agree to abide by the government's plan. Under our constitution, the government does not have this power. It is violative of the right of an individual to own property and use it as he pleases, so long as he does not interfere unreasonably with his neighbors' use and enjoyment of their property. Of course, the owner must abide by reasonable regulations of the use of the land, enacted by the legislature in the exercise of the police power. The state may condemn his land for public use, but it may not take it from him and transfer it to another private individual.

If urban renewal is a necessary and needed instrument of government to correct blighted areas but its use is foreclosed by the restriction of our constitution, the problem may be solved in one of two ways: municipal corporations may exercise their police power to condemn as a nuisance anything that is injurious to the public health, safety, morals, or welfare; or the people may amend the constitution to define urban renewal as a public use. One of these alternatives must be resorted to to achieve this desired end if we are to respect the constitution and the orderly processes of government; otherwise constitutional government will give way to political expediency.

The constitution of the state is a document designed to protect minorities against the appetites and power of majorities. Without the constitution, the safeguarding of the lives, liberties, and properties of minorities would be lost.

Unless the people are willing to change the constitution so as to permit it, one man's property should not be taken by the government and turned over to another to aid in the fulfillment of a utopian ideal of the state.

The urban renewal act as it is now written authorizes the appropriation of private property for private use, and as such runs afoul of amendment 9, Art. 1, § 16, of the Washington constitution.

I would reverse the judgment of the trial court.

OTT, C. J., HILL, and DONWORTH, JJ., concur with ROSELLINI, J.